IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 21, 2015 Session

## KENNETH D. HARDY V. TENNESSEE STATE UNIVERSITY, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 09c4164     Carol Soloman, Judge**

_____

**No. M2014-02450-COA-R3-CV – Filed March 24, 2016**
_____

Former state university police officer brought suit against the university, its governing board, and the university's chief of police asserting causes of action under the Tennessee Public Protection Act ("TPPA"), the Tennessee Human Rights Act ("THRA"), and Title VII of the Civil Rights Act of 1964 ("Title VII"); the officer alleged that he had been discriminated against on the basis of his sex and in retaliation for filing a complaint of discrimination with the university and charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and that he was subjected to a hostile work environment and constructively discharged. At a hearing on the defendants' motion for summary judgment on all causes of action the trial court orally granted the motion in full; in the final order the court adopted findings of fact and conclusions of law which had been prepared by counsel for defendants. The officer appeals the dismissal of all causes of action except for sex discrimination; he also asserts that the findings and conclusions do not comply with Tenn. R. Civ. P. 56.04. Holding that the findings and conclusions adopted by the court reflect the court's independent analysis as required by Tenn. R. Civ. P. 56.04 with respect to the incidents which were alleged to violate the TPPA, we review the grant of summary judgment and affirm the judgment. As to the causes of action arising under Title VII and the THRA, we conclude that TSU was only entitled to summary judgment on the claim that the officer was constructively discharged and on all claims of retaliation except those arising from his transfer to the downtown campus and from multiple warnings the officer received for tardiness, and from his claim of a hostile work environment with respect to numerous write-ups he received. Accordingly, we remand the case for further proceedings related to those claims.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part and Reversed in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J. joined.

Ann Buntin Steiner, Nashville, Tennessee, for the appellant, Kenneth D. Hardy.

Herbert H. Slatery, III, Attorney General and Reporter; Andree S. Blumstein, Solicitor General; and Melissa Brodhag, Senior Counsel, Nashville, Tennessee, for the appellees, Tennessee State University, Tennessee Board of Regents, and Chief Sylvia Russell.

**OPINION**

## I. PROCEDURAL HISTORY

This case comes before us for the second time. A succinct procedural history of the case is contained in the prior opinion:

> Kenneth Hardy ("Hardy") was employed by Tennessee State University ("TSU") as a full-time police officer on its main campus from November 6, 2006, until July 1, 2008, when he was transferred to the downtown campus; he resigned his employment on September 27, 2009. On November 24, 2009 he filed suit against TSU, the Tennessee Board of Regents, and TSU Police Chief, Sylvia Russell ("Defendants") to recover for discrimination on the basis of his sex, retaliation, a hostile work environment, and constructive discharge in violation of the Tennessee Whistle Blower Act, Tenn. Code Ann. § 50-1-304, the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.
>
> In due course, Defendants filed a motion for summary judgment, supported by a statement of undisputed facts and affidavits of Tony Blakey, a lieutenant with TSU's police department; Linda Spears, Director of Human Resources at TSU; Chief Russell; Tonya Christensen, Tennessee Department of Children's Services Team Coordinator; and Mary Moody, General Counsel and Secretary to the Tennessee Board of Regents. In his response to the motion, Hardy filed his own affidavit, a response to the statement of undisputed facts, a statement of additional material facts, excerpts from nine depositions and forty-one exhibits. Defendants replied to Hardy's statement of material facts and moved to strike certain of the exhibits as inadmissible under Tenn. R. Evid. 802 and 901. Thereafter, Hardy filed a motion to allow an adverse inference as to certain questions asked and responses given in the deposition of Sgt. Leslie Jones, a supplemental statement of additional material facts and the deposition

2

of Chief Russell. Defendants also filed a motion to strike Hardy's supplemental statement of facts.

A hearing on the motions was held on July 26, and on August 12 the court entered an order granting Defendants' motion for summary judgment. The order stated that the ruling rendered the other motions moot.

*Hardy v. Tennessee State University, et al.*, M2013-02103-COA-R3-CV, 2014 WL 4181024, at *1 (Tenn. Ct. App. Aug. 22, 2014) (footnote omitted). Mr. Hardy appealed and this court vacated the grant of summary judgment and remanded the case with instructions for the trial court to state the legal grounds for the grant of summary judgment as well as to state findings of fact, as required by Tenn. R. Civ. P. 56.04, and to address the other motions which were pending at the time summary judgment was granted.[1]

On September 19, 2014, TSU moved the trial court to enter an order on the motion for summary judgment and on the pending motions, in accordance with the judgment of this court; TSU filed proposed findings of fact and conclusions of law with the motion.[2] On September 29 TSU renewed its motion for summary judgment. On October 21 Mr. Hardy filed a motion to reopen discovery and take the deposition of TSU's keeper of records in order for him to authenticate certain documents produced by TSU during discovery. The trial court set a hearing on all motions for October 28.

At the October 28 hearing, counsel for TSU presented and explained the proposed findings of fact and conclusions of law it had filed, which included proposed rulings on the pending motions. With regard to the motion to strike the Plaintiff's exhibits, counsel stated that the motion "is a legally valid motion" and that the proposed findings and conclusions noted "that you [the court] were going to deny the motion because you wanted to consider all the exhibits." With respect to the motion to strike Plaintiff's sur-reply, TSU's counsel stated that "procedurally the plaintiff was not entitled to do that but you read all the materials

---

[1] The motions pending at the time the first summary judgment motion was granted were: (1) TSU's motion to strike certain exhibits from Mr. Hardy's response to the summary judgment motion, in which it argued that Mr. Hardy's affidavit contained inadmissible evidence and that the documents and excerpts from the depositions were not properly authenticated pursuant to Tenn. R. Evid. 901. (2) Defendant's motion to strike Mr. Hardy's sur-reply; and (3) Mr. Hardy's motion for the court to make an adverse inference based on the deposition testimony of Sergeant Leslie Kevin Jones, Mr. Hardy's former night shift supervisor at the TSU downtown campus, who had invoked his Fifth Amendment right not to respond to certain questions. These motions will be referred to herein as the "pending motions."

[2] For ease of reference in this opinion, we refer to the pleadings being filed by or on behalf of all Defendants as being filed by TSU.

anyway, so again we've addressed that in the proposed order."[3]  With respect to Mr. Hardy's motion for an adverse inference, counsel argued that the inference that Mr. Hardy sought was immaterial and irrelevant, but that the proposed findings and conclusions stated that the motion was granted solely for the purpose of ruling on the motion for summary judgment.

Counsel for Mr. Hardy argued that TSU's motion to strike the exhibits was not well taken because the evidence tendered was proper; that TSU acknowledged that the court should grant the motion for adverse inference and infer that Sergeant Jones had improperly left his shift while being paid; counsel presented no argument as to the motion to strike Mr. Hardy's sur-reply.  With respect to the pending motions, the court ruled:

> THE COURT: All right.  So on the motions, I'm not going to strike any of the - - I'm going to deny the motion to strike.  And I'm going to grant the motion for an adverse inference, and a motion to strike the surreply, I'm going to grant because there is no such thing.

The court then proceeded to make oral findings of fact, discussed in detail *infra*, and requested that TSU's attorney draft an order adopting TSU's proposed findings and conclusions in full.

On November 5, 2014, the final order, entitled "Order on Defendant's Motion for Summary Judgment and Accompanying Motions" (herein "the November 5 Order") was entered.  With respect to the pending motions, the court denied TSU's motion to strike Plaintiff's exhibits and portions of his affidavits, stating that, though the motion was well-grounded in law, it was denied "for the purposes of ruling on the motion for summary judgment only…so as to give [Mr. Hardy] every opportunity to place his opposition before the Court;" the court granted TSU's motion to strike Plaintiff's sur-reply and Plaintiff's motion for an adverse inference.[4]  The court denied Mr. Hardy's motion to take the deposition of the keeper of the records as moot, stating that, because the motion to strike Mr. Hardy's exhibits was denied, "there is no need to re-open the evidence to authenticate documents."  The court granted TSU's renewed motion for summary judgment; the court

---

[3] The "proposed order" counsel referenced was, in fact, the Proposed Findings of Fact and Conclusions of Law.

[4] The court described the testimony in question as "almost incomprehensible" and determined that, for purposes of ruling on TSU's motion for summary judgment only, the motion for adverse inference was granted.  The court also noted that Sergeant Jones' testimony was "not material to the resolution of the motion for summary judgment because [Mr. Hardy] cannot prove other elements of his Tennessee Public Protection Act claim."

4

then signed the proposed findings and conclusions, which were then filed immediately following the order (referred to herein as "the Findings and Conclusions").

Mr. Hardy appeals, articulating the following issues:

1. The findings of fact and conclusions of law entered by the trial court do not comply with Tenn. R. Civ. P. 56.04.
2. The trial court erred in dismissing Mr. Hardy's retaliation claim.
3. The trial court erred in dismissing Mr. Hardy's constructive discharge claim and Tennessee Whistleblower claim.
4. The trial court erred in dismissing Mr. Hardy's hostile work environment claim.
5. Mr. Hardy did not engage in any illegal activities.
6. The trial court erred finding the testimony for which Mr. Hardy requested an adverse inference was "almost incomprehensible."
7. Mr. Hardy did report illegal activities and refused to engage in illegal activities for protection under TTPA.

## II. DISCUSSION[5]

Inasmuch as neither party assigns error with respect to the disposition of the pending motions, which were ruled upon prior to the grant of the renewed motion for summary judgment, we first address Mr. Hardy's contention that the Findings and Conclusions do not comply with Tenn. R. Civ. P. 56.04 because they are not the product of the court's own deliberation.

### A. Compliance with Rule 56.04

Tenn. R. Civ. P. 56.04 requires the trial court to state the legal grounds upon which it denies or grants a motion for summary judgment. In *Smith v. UHS of Lakeside, Inc.*, the Tennessee Supreme Court discussed the manner in which a court's adoption of party-prepared findings of fact and conclusions of law may comply with Rule 56.04:

> [M]ost courts have approved, but not recommended, the practice of trial courts receiving and using party-prepared findings of fact, conclusions of law, and orders as long as two conditions are satisfied. First, the findings and

---

[5] In the Findings and Conclusions, the trial court identified four areas into which Mr. Hardy's claims fell: sex discrimination, retaliation, hostile work environment/constructive discharge, and whistleblower. In this opinion, in the interest of completeness and clarity, we will discuss the issues articulated by Mr. Hardy in the context of the areas identified by the trial court.

5

conclusions must accurately reflect the decision of the trial court. Second, the record must not create doubt that the decision represents the trial court's own deliberations and decision.

\*\*\*

Tenn. R. Civ. P. 56.04 requires the trial court, upon granting or denying a motion for summary judgment, to state the grounds for its decision *before it invites or requests the prevailing party to draft a proposed order*. Not only will this requirement assure that the decision is the trial court's, it will also (1) assure the parties that the trial court independently considered their arguments, (2) enable the reviewing courts to ascertain the basis for the trial court's decision, and (3) promote independent, logical decision-making.

439 S.W.3d 303, 315-17 (Tenn. 2014) (internal citations and footnote omitted) (emphasis added).

At the October 28 hearing, after hearing arguments of counsel, the court proceeded to discuss the evidence, the applicable law, and the arguments, and granted the motion. The court then instructed TSU's counsel to prepare an order, engaging in the following dialogue:

MS. BRODHAG [TSU's counsel]: Everything I have to say in terms of how it - - we think that we addressed and on the motion for summary judgment and that you had addressed last time, I put in the proposed order. I don't have anything to add to the proposed order, that would, I think, take care of the issue that the Court of Appeals had.

THE COURT: The proposed findings of fact and conclusions - -

MS. BRODHAG: Yeah, conclusions of law.

The COURT: And then I'll need an order saying that - - do I need an order on top of an order?

MS. BRODHAG: I thought that - - it says it grants it. I can - - I thought it said it granted it.

\*\*\*

THE COURT: I like this motion for - - this proposed order. I think it includes all of my fact findings, and if there is any finding that you have a question about, Ms. Steiner [Mr. Hardy's counsel], let me address it now while we have time.

6

Although the trial court stated the grounds for its decision to grant TSU's motion for summary judgment prior to instructing counsel for TSU to prepare the order memorializing its ruling, the oral ruling was not transcribed and incorporated into the November 5 order; rather, the court entered as a separate document, with minor modifications, TSU's proposed findings of fact and conclusions of law and made reference to that document in the order.[6]

The usual practice is to attach and incorporate a transcript of the oral ruling to the final order; in that fashion, there is no doubt that the final order reflects the court's reasoning. This was not done in this case. However, because the practice of adopting party-prepared findings of fact and conclusions of law is not altogether improper, we proceed to determine whether the findings prepared by TSU and adopted by the court comply with Rule 56.04 and meet the two conditions articulated in *Smith v. UHS of Lakeside.*

The Findings and Conclusions did not contain specific factual findings or state specific conclusions of law relative to each legal claim asserted by Mr. Hardy; rather, the document included a summary section entitled "Summary of Facts" and separate sections discussing Mr. Hardy's claims for sex discrimination, retaliation, hostile work environment and constructive discharge, and whistleblower. The Summary of Facts is a three page narrative of events which occurred during Mr. Hardy's employment which relate to the specific claims he asserted; additional facts are included in the separate discussions of each claim. We treat the court's recitation of facts in both the Summary of Facts and in the discussion of each claim as responsive to the instruction of this court when the case was remanded. As we review this issue, we compare the facts as stated in the oral ruling at the hearing with respect to each of the claims asserted by Mr. Hardy with those in the Findings and Conclusions.[7]

---

[6] As respects the summary judgment motion, the November 5 order concluded:

> After a lengthy oral argument and after reviewing the pleadings on file, the motions, the responses to the motions, the replies, the depositions, the affidavits, and the exhibits filed by the parties, the Court grants the Defendants' Motion for Summary Judgment as there are no genuine issues of material fact, the motion is supported by the record, and the Defendants are entitled to a judgment on all of the Plaintiff's claims as a matter of law. The court hereby adopts the Defendants' proposed findings of fact and conclusions of law as its own.

The court also noted in the order: "Defendants' Proposed Findings of Fact and Conclusions of law contains a section on the Court's ruling on the accompanying motions. The Court does not agree that the Defendants' Motion to Strike the Sur-Reply should be denied. The Court expressly grants the motion in this Order."

[7] Our review is specific to the record before us and should not be construed to set a standard for either the preparation of findings of fact by the trial court or the review of same by this court.

### 1) *Claim Under Title VII of the Civil Rights Act of 1964; and the Tennessee Human Rights Act for Sex Discrimination*[8]

Mr. Hardy alleged that he was subjected to sexual discrimination in violation of state and federal laws based on an incident in which he was disciplined for bringing his daughter to work, whereas a female employee who regularly brought her child to work was not subjected to disciplinary action. At the hearing on the motion for summary judgment, the court stated the following findings with regard to this claim:

> So his -- and counsel admits that the sexual discrimination is weak, and I can go that there is no material question of fact on that for each one because, one, I don't believe he is a member of a protected class.
>
> But if he was, he -- there's a total difference in the job descriptions and the job qualifications of a dispatcher that's clerical in nature and a police officer that's service trained and requires a college degree. The dispatcher's job did not require a college degree, first.
>
> Then, second, the act itself that he was reprimanded for, there's no sexual discrimination in that the dispatcher was allowed to bring the child to work for about 15 minutes until the daycare opened. But he took his daughter to work while he was in gun training class all day, which was against the rules. You're not supposed to bring a child to work, and he ignored that rule.
>
> And then he did not complete the gun class, in fact. Did not complete the training. So he was reprimanded for not completing the training, but that had nothing to do with sexual discrimination. He was reprimanded because he did not complete the training.

In the Summary of Facts, the court made the following findings relative to this claim:

> On September 30, 2007, the TSU Police Department posted a memorandum on the bulletin board notifying personnel of different options for two day mandatory training in mid-October. Mr. Hardy claims never to have seen the posting. Sergeant Jones advised Mr. Hardy that he needed to attend training but inadvertently told Mr. Hardy that the training was one day instead of two. Mr. Hardy planned to attend on Sunday, October 14th.

---

[8] While plaintiff does not assign error to the dismissal of the claim of sexual discrimination, we have included this claim in our discussion of the first issue he presents.

On Saturday October 13, 2007, Mr. Hardy was scheduled to work but was ill so he called to notify TSU of his illness. The dispatcher mentioned to him that training was two days and began that day. Despite his illness, Mr. Hardy came to the training. He brought his 11 year old disabled daughter with him and planned to leave her in the car all day. Because Mr. Hardy was late upon arrival, missed part of the training session, and had his daughter in the car, the training officer told him to come back on Sunday and Monday.

The next week the training officer reported to Chief Russell that Mr. Hardy had brought his daughter to work in violation of the TSU policy prohibiting employees from bringing their children to work and missed training on Monday. Chief Russell wrote Mr. Hardy a "letter of warning" for both violations. On October 29, 2007, he submitted a formal complaint to TSU's Office of Equity, Diversity, and Compliance. He claimed to be the victim of discrimination based on age, sex, veteran's status, and childcare obligations. He demanded that the letter of warning be removed from his personnel file; he wanted a "written and verbal apology from Chief Russell" as well as nine other demands. Despite the fact that the notice of the training had been posted two weeks in advance and Mr. Hardy was given the opportunity to attend training on another day, TSU agreed to remove the letter of warning from Mr. Hardy's personnel file.

Mr. Hardy continued to demand a personal apology from Chief Russell. When it was not forthcoming, he filed an EEOC charge complaining of sex discrimination on March 17, 2008. The basis of his charge was that a female dispatcher in the TSU Police Department was permitted to bring her daughter to work for a short time and take a break soon after arriving for her shift to walk her daughter across the street to day care.

(Footnotes omitted). The section of the Findings and Conclusions that specifically discussed the sexual discrimination claim also contained pertinent factual findings:

The evidence demonstrates that the female dispatcher in question had requested an accommodation to her schedule to allow her to bring her child to work for a few minutes before taking the child to a nearby daycare while Mr. Hardy missed a training session, the notice for which had been timely posted, and then in an attempt to attend the training session brought his disabled daughter to a firearm training session where he intended to leave her in the car all day. When the training officer realized the child was in the car, he asked Mr. Hardy to leave. Thus, Mr. Hardy received a disciplinary warning for

9

violating the TSU's Police Department's prohibition regarding bringing children to the workplace.

The evidence also demonstrates that Mr. Hardy was a commissioned police officer whose job was to patrol TSU's campus for security purposes. As a commissioned police officer, Mr. Hardy was certified by the State of Tennessee, Peace Officer Standards and Training (P.O.S.T.) Commission to make arrests, detain and question persons suspected of criminal behavior, conduct searches and seizures with probable cause, carry a gun, request a search warrant, operate a police vehicle, and to be generally familiar with police practices and procedures. A police officer at Tennessee State University was required to be commissioned and was required to have a college education and/or similar specialized training and experience. The female employee was a dispatcher whose job was administrative and clerical in nature. A dispatcher received and transmitted police dispatches and filed paperwork. No specialized training or college education was required. The female employee in question was not a commissioned police officer.

The Findings and Conclusions stated that summary judgment on this claim was appropriate, holding:

The Court finds that Mr. Hardy was not similarly situated to the female dispatcher, and that the accommodation made to the female dispatcher was not unreasonable given the administrative nature of her job function. The circumstances are also quite different. Mr. Hardy made a rash decision to bring his daughter to work and leave her in the car because he did not keep himself apprised of the times for a required session.

. . . Mr. Hardy initially received a letter of warning for missing the training session and bringing his daughter to work. After he complained, the letter of warning was removed from his personnel file. The Court agrees [with Defendants] and finds that Mr. Hardy suffered no adverse employment action. Therefore, summary judgment in favor of the Defendants is appropriate as Defendants have affirmatively negated two essential elements of Mr. Hardy's sex discrimination claim and/or shown that Mr. Hardy cannot prove essential elements of his claim.[9]

---

[9] While not denominated as findings of fact, the court explained its ruling:

The Defendants contend that summary judgment is appropriate because (1) the

10

While the findings in the Findings and Conclusions are more detailed than those in the oral ruling, they incorporate the facts and reasoning expounded upon by the court in the October 28 hearing—the clerical worker's accommodation; the difference in job duties and skill between a police officer and a dispatcher; and the practical difference in Mr. Hardy's attempt to bring his daughter to work for a substantial part of the day without permission and the dispatcher having had prior approval to bring her daughter to work for a few minutes before taking her to daycare. The Findings and Conclusions accurately reflect the deliberation of the court at the October hearing with respect to this claim.

### 2) *Retaliation Under Title VII of the Civil Rights Act of 1964 and the Tennessee Human Rights Act*

The record shows that Mr. Hardy filed a complaint on October 30, 2007, with TSU's Equity, Diversity and Compliance Office in which he alleged discrimination "because of my age, sex, veteran status, and childcare obligations" with respect to an incident where he did not attended two days of training; a charge on or about March 17, 2008, with the Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination relative to the training incident and the lieutenant position which was filled in October 2007; and an EEOC charge on June 24, 2008, alleging retaliation with respect to write-ups he received in May and June 2008. In the motion for summary judgment TSU identified seven incidents, culled from the complaint and Mr. Hardy's deposition, which he alleged constituted retaliation for his filing of these complaints.[10]

### i. *Denial of Promotion to Lieutenant*

The only statement by the court at the hearing relative to Mr. Hardy's claim that he was denied a promotion to lieutenant was: "[i]t says that he was qualified for job or

---

female dispatcher was not similarly situated and (2) there was no adverse employment action. The evidence demonstrates that the female dispatcher in question had requested an accommodation to her schedule to allow her to bring her child to work for a few minutes before taking the child to a nearby daycare while Mr. Hardy missed a training session, the notice for which had been timely posted, and then in an attempt to attend the training session brought his disabled daughter to a firearm training session where he intended to leave her in the car all day. When the training officer realized the child was in the car, he asked Mr. Hardy to leave. Thus, Mr. Hardy received a disciplinary warning for violating the TSU's Police Department's prohibition regarding bringing children to the workplace.

[10] We do not address the question of whether a complaint filed with the TSU Equity, Diversity and Compliance Office is protected by Title VII or the Tennessee Human Rights Act. Mr. Hardy addressed each incident in his response to the motion and did not assert that there were any other retaliatory incidents.

promotion sought. There's no material evidence that says he was qualified."[11] The Findings and Conclusions contained the following findings with respect to the denial of promotion to lieutenant:[12]

> TSU records reflect that Mr. Hardy was denied the promotion prior to the event (training session – October 13, 2007) that is the basis of sex discrimination complaint. After receiving applications for the lieutenant position, Chief Russell submitted a list of candidates to be interviewed for the position on September 26, 2007. Mr. Hardy was not on the list because Chief Russell did not believe he was qualified.

The Findings and Conclusions contain findings with respect to the chronology of events surrounding the denial of the promotion which findings were not mentioned by the court at the hearing. In the absence of more detailed oral findings, we are not persuaded that the Findings and Conclusions accurately reflects the court's own analysis of and deliberations relative to the evidence presented as to this claim.

### ii. Denial of Promotion to Sergeant

Mr. Hardy claimed that he was denied a promotion to sergeant in January of 2008. At the hearing the court made the following statement relative to the sergeant position: "I can't find that he was denied a promotion to sergeant because he didn't take the test. So that's not available to him." In the November 5 order, the court stated the following findings in its analysis:

> Part of the application process for the sergeant position was the completion of an interview questionnaire which was to be completed by each applicant under a monitoring proctor. Defendants presented undisputed evidence that Mr. Hardy did not complete the required interview questionnaire and was therefore not considered for the position.

(Footnote omitted). As with the lieutenant position, we are not persuaded that the order accurately reflects the court's own analysis and deliberations relative to the evidence

---

[11] The record is not clear what the court is referring to by the term "it".

[12] There were no facts relative to either the lieutenant or sergeant positions contained in the "Summary of Facts" portion of the findings and conclusions; rather the court stated: "Mr. Hardy claims that later he was denied two promotions and was inappropriately disciplined in retaliation for making his sex discrimination complaint. The alleged failures to promote and the disciplinary actions will be discussed below in the analysis of Mr. Hardy's retaliation claim."

presented. The court did not elaborate at the hearing on the application process or the qualifications for the sergeant position and we do not assume that the court's characterization of a "test" equates to the "questionnaire" referenced in the Findings and Conclusions.

### iii. Warning for Failing to Follow an Order

Mr. Hardy contends that he was disciplined for failing to supplement a report he wrote in response to a panty raid incident on campus. At the October 28 hearing, the court addressed Mr. Hardy's reprimand for failure to follow a direct order by stating, "although he had a disciplinary action of failing to follow a direct order which was valid, he wasn't -- he wasn't disciplined for it."

There are no factual findings in the Summary of Facts that pertain to this claim in the Findings and Conclusions; in the section discussing the claim, the court made the following findings:

> On March 28, 2008, Mr. Hardy was verbally reprimanded for refusing to follow an order from a superior. The evidence demonstrates that Mr. Hardy has been on the scene of a panty raid when he assisted another officer in apprehending a male student with a pair of panties. The student told Mr. Hardy that the panties were given to him so Mr. Hardy let the student keep the panties. Sergeant Jones ordered Mr. Hardy to supplement his report to explain why he had returned evidence to a perpetrator. Mr. Hardy refused and was overheard by Lieutenant Blakely.

> It appears from the record that there was at least some confusion amongst the officers in regard to evidence protocol.

The remarks at the hearing quoted above do not constitute findings with respect to Mr. Hardy's claim; in contrast, the order contains detailed factual findings surrounding the incident. The order does not accurately reflect the trial court's deliberation.

### iv. Warning for Improper Notice of Absence

At the hearing, the court did not articulate any findings that directly addressed Mr. Hardy's contention that he was verbally reprimanded for notifying a supervisor of his absence by text message contrary to the protocol for giving such notification.[13] While there

---

[13] The only statement by the court at the hearing was the following, which occurred in the context of a general discussion of the adverse employment actions claimed by Mr. Hardy: "[Mr. Hardy] received no reprimand in

are no factual findings in the Summary of Facts, the section of the order discussing the improper notification claim contained the following findings:

> The evidence demonstrates that Mr. Hardy received a verbal warning for failing to follow the proper procedure for notifying his supervisor of an absence. The record again demonstrates that there was at least some confusion amongst the officers in regard to the use of text messages as a means of notifying a supervisor of an absence. Mr. Hardy received the same scores on his evaluation in 2008 as he received in 2007 before his first discrimination complaint to TSU.

Inasmuch as the court failed to state findings with regard to the warning for improper notice at the hearing, the Findings and Conclusions do not reflect the independent judgment or logic of the court.

### v. Denial of Request for Leave in 2008

Mr. Hardy contends that his request for annual leave was denied after he filed his EEOC complaint. At the hearing, the court did not state any findings with respect to this incident. The Findings and Conclusions contained findings as follows:

> [I]t is undisputed that Mr. Hardy's timesheets reflect that he took annual leave from July 25 to July 29, 2008, did not work on July 30 and 31, and took annual leave from August 1 to August 5, and did not work August 6 and 7. Thus, Mr. Hardy not only received more annual leave than he requested but due to scheduling he did not work for 14 straight days.

In light of the fact that the court did not state any findings at the hearing, the Findings and Conclusions do not reflect the independent judgment or logic of the court.

### vi. Transfer to Downtown Campus

Mr. Hardy claims that his transfer from TSU's mains campus to the downtown campus was retaliatory. In the October 28 hearing, the court stated the following:

> As much as Ms. Steiner would love for me to say there was an adverse employment action going to a nice well supplied couple of buildings that were quiet and mannerly and is totally different from a college campus that has a

the form of money, position. This man was exactly the same as he always had been ...."

number of buildings, a huge campus, with often crimes being committed on the campus -- not on a regular basis, but there is always the apprehension that that would occur, and they've had some shootings, et cetera.

And this police officer was in total command of the facilities. He was the one that was in charge of everything at the main campus. So he wasn't -- he didn't have an adverse employment action.

His salary wasn't decreased. His evaluations improved, so his chance of furthering himself was enhanced not -- I cannot find that there is any material -- in fact, I can't find that there is any fact that qualifies as a description of adverse employment action. His vacation wasn't cut. His benefits weren't cut. He was not -- I just -- I can't -- I can't figure out what -- I don't see any material issue. I don't see any issue, let alone a material issue, that he experienced an adverse employment action.

***

I don't – it's not a material fact that Mr. Hardy might have considered the downtown campus of TSU a demotion because he has no reason to think that. He was allowed to carry his gun. He had his radio. He had contact with students, people. He had complete control over his actions that he performed. And he had no complaints for a whole year until -- until DCS changed his schedule and it interfered with the TSU job.

The Summary of Facts contains the following findings:

On July 1, 2008, Mr. Hardy was transferred to TSU's downtown campus. In August of 2008, the third shift at the downtown campus was eliminated so Mr. Hardy was placed on the second shift with working hours from 3:00 p.m. to 11:00 p.m. Mr. Hardy did not complain about the shift change. One year later in August 2009, DCS changed Mr. Hardy's schedule from 6:30 a.m. to 2:30 p.m. to 7:00 a.m. to 3:30 p.m. Mr. Hardy was no longer able to leave his job at DCS early enough to arrive at TSU by 3:00 pm, and he began arriving late for work at TSU and received repeated warnings.

DCS also began an internal affairs investigation in August 2009 after it learned that Mr. Hardy was working at TSU while he was on call at DCS. DCS determined that no one had ever approved Mr. Hardy's dual employment. Mr. Hardy was disciplined and asked to resign from one job or the other. Mr. Hardy resigned his TSU employment on September 27, 2009.

15

Prior to Mr. Hardy's resignation from TSU, TSU had also begun its own investigation into Mr. Hardy's second job with DCS. TSU determined that Mr. Hardy had not only violated State law regarding dual employment but had also falsified his time card on multiple occasions by representing that he was working for TSU and DCS simultaneously.

(Footnote omitted). The court's findings at the hearing were limited to determining that certain benefits of Mr. Hardy's employment, e.g., salary and vacation, were not changed as a result of the transfer; the Findings and Conclusions discusses other topics, including DCS' and TSU' separate investigations of Mr. Hardy's dual employment and the specifics of his schedule at DCS. The Findings and Conclusions do not reflect the court's independent judgment and analysis.

### vii. Multiple Warnings for Tardiness

Mr. Hardy contends that warnings he was issued for being late to his shift were issued in retaliation for reporting illegal activities engaged in by his former supervisor, Sergeant Jones. In the October 28 hearing, the court stated the following findings with respect to the warnings:

He can't do anything to - - he can't perform bad acts and expect no disciplinary results from the bad acts. And I think that's what he's asking me to do, to let him go to trial and see if he could profit from his acts where he was working two jobs without permission, and had been for a long period, and was becoming habitually late because he was working two jobs.

Pertinent to this issue, in the Summary of Facts the court stated the following: "Mr. Hardy was no longer able to leave his job at DCS early enough to arrive at TSU by 3:00 pm, and he began arriving late for work at TSU and received repeated warnings." In the specific discussion of Mr. Hardy's transfer and the subsequent warnings he received for being late for his shift, the Findings and Conclusions contain the following findings:

One month after Mr. Hardy transferred to the downtown campus, he was required to change his shift from the 11:00 p.m. to 7:00 a.m. (third shift) to the 3:00 p.m. to 11:00 p.m. (second shift) as the downtown campus' third shift was eliminated. The undisputed evidence demonstrates that there were no problems with TSU's shift change for approximately one year. Then DCS changed Mr. Hardy's schedule from 6:30 a.m. to 2:30 p.m. to 7:00 a.m. to 3:00 p.m. At that point, Mr. Hardy began arriving for work at TSU late and received repeated warnings before he ultimately resigned.

16

A comparison of court's remarks with the Findings and Conclusions leads us to conclude that the latter does not reflect the court's independent logic and reasoning.

### 3) *Constructive Discharge/Hostile Work Environment Under Title VII of the Civil Rights Act of 1964 and the Tennessee Human Rights Act*

Mr. Hardy contends that the verbal and written reprimands issued by his supervisors at TSU subjected him to a retaliatory hostile work environment leading to his constructive discharge. The court stated the following with respect to the constructive discharge and hostile work environment claims at the October 28 hearing:

> [H]e wasn't fired. He was fired in form only, not in substance. After he resigned, he was fired. The firing has no bearing on this case. It was all - - probably they would have been best to just put a letter in his file that said, you know, they had difficulties with him and why they wouldn't want to hire him back. But the firing has no basis - - no bearing whatsoever on his salary, on his ability to work for DCS, on his ability to work for other state employment.

The court did not make factual findings in the Summary of Facts on either of these claims; in the section of the Findings and Conclusions dedicated to these claims, the court made the following determination:[14]

> Mr. Hardy has not demonstrated harassing behavior "sufficiently severe or pervasive to alter the conditions of . . . employment." *Pennsylvania State Police v. Suders*, 124 S. Ct. at 2347. He simply reiterates the claims of retaliation analyzed above. Thus, Defendants have affirmatively negated an essential element of Mr. Hardy's hostile work environment/constructive discharge claim and/or shown that Mr. Hardy cannot prove an essential element of his claim.

> <u>No Termination of State Employment</u>

> Additionally fatal to Mr. Hardy's claim is that he cannot prove that he was discharged from the employment of the State of Tennessee. *After resigning from TSU, Mr. Hardy remained employed by the State of Tennessee in a full*

---

[14] Certain portions of this section in the Findings and Conclusions contain language more appropriately characterized as analysis or discussion; in the interest of clarity, we have italicized what we deem as the factual findings.

17

*time position as a case manager at the Department of Children Services. He then transferred to the Tennessee Emergency Management Agency and is currently employed there.* Thus, Defendants have affirmatively negated an essential element of Mr. Hardy's hostile work environment/constructive discharge claim and/or shown that Mr. Hardy cannot prove an essential element of his claim.

No Causal Connection

Finally, Mr. Hardy can point to no act of retaliation that caused him to resign. The evidence is undisputed that *Mr. Hardy encountered no problems with TSU's shift change for approximately one year. Then DCS changed Mr. Hardy's schedule from 6:30 a.m. to 2:30 p.m. to 7:00 a.m. to 3:00 p.m. At that point, Mr. Hardy began arriving for work at TSU late and received repeated warnings before he ultimately resigned.* While unwarranted disciplinary warnings may be considered acts of retaliation, these were reasonable and justified: *Mr. Hardy was admittedly late.* As discussed above, *the action that adversely impacted Mr. Hardy was not the shift change at TSU but the shift change at DCS.* The Court finds that Defendants are entitled to summary judgment as Defendants have affirmatively negated essential elements of Mr. Hardy's hostile work environment/constructive discharge claim and/or shown that Mr. Hardy cannot prove essential elements of his claim.

(Footnote omitted). At the hearing, the court made statements which led the court to conclude that Mr. Hardy was fired "in form only" and that his firing "has no bearing on this case." The Findings and Conclusions address Mr. Hardy's continued employment with the State of Tennessee and concludes that, because of this employment, TSU negated an essential element of his constructive discharge claim. Relative to this claim, the court's remarks at the hearing and the Findings and Conclusions focus on the legal determination of the significance of Mr. Hardy's separation from his employment rather than resolving any contested facts relative thereto. In this instance we are led to conclude that any factual difference between the oral remarks and the Findings and Conclusions would not be material and would not preclude summary judgment.

There is a great disparity in the court's statement that Mr. Hardy was fired in form only and the determination that Mr. Hardy cannot prove that he was discharged by the State of Tennessee. Moreover, the court fails to mention the shift change at DCS in the oral hearing, but makes factual findings with respect to Mr. Hardy's shift change at DCS in the order. Accordingly, the order creates doubt that the decision represents the trial court's independent deliberation and reasoning.

18

#### 4) *Constructive Discharge under the Tennessee Public Protection Act*

Mr. Hardy also claims that he was constructively discharged in violation of Tenn. Code Ann. § 50-1-304 for refusing to remain silent about Sergeant Jones leaving his shift while on the clock. At the hearing, the court stated the following:

> So he was not terminated. I don't think you can get around the fact that he wasn't terminated. So retaliation as a whistleblower is not available. There were no illegal activities that he reported.
>
> And I don't think that there is a causal connection between his refusal to remain silent - - which I don't know that he was - - he seemed like he was talking fine - - and his resignation from TSU. He resigned because he had to choose one job over the other, not for the reason that TSU was saying that he was reporting an illegal activity. He chose. TSU did not choose. And he's still working for the State of Tennessee.

The court made no findings in the summary of facts section of the order. However, the court did state findings with respect to each of the four essential elements of Mr. Hardy's claim in the section of the order dedicated to addressing this claim:[15]

> No Termination of State Employment
>
> The undisputed evidence is that Mr. Hardy held two full time State jobs without approval as required by the State's dual employment rule. Thus, he was in violation of State law. When he resigned from TSU, he continued working for the State at DCS. Later, he transferred to the Tennessee Emergency Management Agency and is currently employed there. He never lost his State employment. Mr. Hardy seeks legal relief in regard to a job he was forbidden by law to work.

---

[15] A claim under the Tennessee Public Protection Act (TPPA) includes four elements:
(1) the plaintiff was an employee of the defendant;
(2) the plaintiff refused to participate in or remain silent about illegal activity;
(3) the defendant employer discharged or terminated the plaintiff's employment; and
(4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

*Williams v. City of Burns*, 465 S.W.3d 96, 111 (Tenn. 2015) (citing *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 26-27 (Tenn. 2011)).

\*\*\*

No Illegal Activities

…Mr. Hardy has presented no actual proof of any illegal activity. In particular, he accuses Sergeant Jones of reporting that he was working while he visited his girlfriend's house. Mr. Hardy presents a confusing deposition of Sergeant Jones in which he on occasion pleads the 5th Amendment in response to questions. It is difficult to determine from the deposition testimony whether Sergeant Jones is avoiding self-incrimination in regard to improperly reporting his work hours or because he is being asked personally embarrassing questions.

\*\*\*

No Reporting Illegal Activities

…The facts of this case do not follow the typical whistleblower case. Despite the fact that Mr. Hardy claims that almost all of his supervisors were engaged in illegal activity, he did not report any alleged illegal activity to anyone. In regard to the one sergeant he accuses of improperly reporting his time, Mr. Hardy approached this sergeant and essentially made vague threats to him by stating that if the sergeant's superiors asked the right questions, he (Mr. Hardy) would not lie for the sergeant. When the sergeant attempted to clear the air, apparently some sort of confrontation resulted.

\*\*\*

No Causal Connection

Mr. Hardy has not demonstrated a causal connection between any alleged illegal activity (and/or the reporting thereof) and his ultimate resignation. All of the alleged illegal activities occurred while Mr. Hardy worked on the main campus from 2006 to July 2008. He was transferred to the downtown campus over a year before he resigned in September 2009. He does not allege any illegal activity at the downtown campus, nor does he allege that he reported illegal activity while on the downtown campus.

The record suggests that it was Mr. Hardy's own illegal conduct that caused him to resign from TSU. After DCS investigated Mr. Hardy's unapproved dual employment and told him he must resign from one job or the other, Mr. Hardy resigned from TSU.

The record indicates that the court engaged in its own independent analysis and thought with respect to this claim. Both the findings in the document adopted by the court and the statements made by the court at the oral hearing pertain to the essential elements of a whistleblower claim. While the court discusses only three of the elements during the hearing and the document contains factual findings pertaining to all four elements, taken in context and considering the record as a whole, we conclude that the court engaged in its own independent thought process in arriving at its conclusion relative to this specific claim.

Upon our consideration of the identified claims, we have determined that the record shows that the findings and conclusions prepared by counsel and adopted by the court reflect the court's independent analysis as required by Tenn. R. Civ. P. 56.04 relative to two of Mr. Hardy's claims: sex discrimination and violation of the TPPA.

Mr. Hardy has not assigned error with respect to the grant of summary judgment on the sexual discrimination claim; consequently, we proceed to review the trial court's grant of summary judgment on the TPPA claim.

### B. Summary Judgment on TPPA Claim

A party is entitled to summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits…show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04.[16] The party seeking summary judgment "bears the burden of demonstrating that no genuine issue of material fact exists and that it is entitled to

---

[16] In support of the motion, TSU filed a memorandum of law; a statement of undisputed facts; and affidavits by Lieutenant Tony Blakely, TSU Director of Human Resources Linda Spears (with eleven attached exhibits), TSU Police Chief Sylvia Russell (with one exhibit attached), Department of Children's Services Team Coordinator Tonya Christensen (four exhibits attached) and Tennessee Board of Regents General Counsel Mary G. Moody (two exhibits attached). In support of his response to the motion, Mr. Hardy filed his response to TSU's statement of undisputed facts and a statement of additional material facts. Also filed by Mr. Hardy were fifty-one exhibits, which included: his affidavit; various TSU employment policies and forms; the complaint Mr. Hardy filed with the TSU Office of Equity, Diversity and Compliance and the charges he filed with the Equal Employment Opportunity Commission; various email and letter correspondence; report of the incident which led to a verbal warning; Mr. Hardy's performance evaluations; Mr. Hardy's resignation letter and his letter of termination; notice of transfer dated July 1, 2008; report of investigative inquiry performed by Tennessee Department of Children's Services; and depositions of Chief Sylvia Russell, Lieutenant James Kizer, Linda Spears, Department of Human Resources employee May Elizabeth Sneed, TSU Police Force Officer Walter Farmer, Sergeants Frank White and Leslie Jones, Lieutenant Philip Beene, and DCS Special Investigator Ronald Morris.

judgment as a matter of law." *Armoneit v. Elliot Crane Service, Inc.*, 65 S.W.3d 623, 627 (Tenn. Ct. App. 2001).

A succinct statement setting forth the standard for considering motions for summary judgment where the moving party does not bear the burden of proof was set forth by this court in *Hall v. Gaylord Entm't Co.*:[17]

> When the moving party does not bear the burden of proof at trial, the moving party may make the required showing and shift the burden of production either "(1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, ⸺ S.W.3d ⸺, No. W2013-00804-SC-R11-CV, at *22 (Tenn. Oct. 26, 2015).
>
> ***
>
> If the moving party does satisfy its initial burden of production, "the nonmoving party 'may not rest upon the mere allegations or denials of [its] pleading,' but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, 'set forth specific facts' *at the summary judgment stage* 'showing that there is a genuine issue for trial.' " *Rye*, ⸺ S.W.3d ⸺, No. W2013-00804-SC-R11-CV, at *22 (quoting Tenn. R. Civ. P. 56.06). The nonmoving party must demonstrate the existence of specific facts in the record that could lead a rational trier of fact to find in favor of the nonmoving party. *Id.* If adequate time for discovery has been provided and the nonmoving party's evidence at the summary judgment stage is insufficient to establish the existence of a genuine issue of material fact for trial, then the motion for summary judgment should be granted. *Id.* Thus, even where the determinative issue is ordinarily a question of fact for the jury, summary judgment is still appropriate if the evidence is uncontroverted and the facts and inferences to be drawn therefrom make it clear that reasonable persons must

---

[17] Prior to October 26, 2015, courts which were considering motions for summary judgment were to apply the standard set forth in *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1 (Tenn. 2008) for cases filed before July 1, 2011; for cases filed after July 1, 2011, courts are to apply Tenn. Code Ann. § 20-16-101. On October 26, 2015, in *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 273 (Tenn. 2015), our Supreme Court overruled *Hannan* and adopted a standard for cases filed prior to July 1, 2011, that is consistent with the standard at applicable to Federal Rule 56. Inasmuch as this case was filed November 24, 2009, we apply the standard as directed by the *Rye* court.

agree on the proper outcome or draw only one conclusion. *White v. Lawrence*, 975 S.W.2d 525, 529–30 (Tenn. 1998).

*Hall*, No. M2014-02221-COA-R3-CV, 2015 WL 7281784, at *4-5 (emphasis in original) (footnotes omitted). We review the trial court's ruling on a motion for summary judgment *de novo* with no presumption of correctness, as the resolution of the motion is a matter of law. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 83 (Tenn. 2008). We view the evidence in favor of the non-moving party by resolving all reasonable inferences in its favor and discarding all countervailing evidence. *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003); *Godfrey*, 90 S.W.3d at 695.

### 1) *Constructive Discharge*[18]

Under the Tennessee Public Protection Act, employers are prohibited from discharging or terminating an employee "for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). In order to establish a claim of retaliatory discharge under the TPPA, a plaintiff must establish (1) that he is an employee of the defendant employer; (2) that he refused to participate in, or remain silent about, illegal activities; (3) that he was discharged from his employment; and (4) that an exclusive causal connection exists between his refusal to participate in or remain silent about illegal activities and his termination. *Williams v. Greater Chattanooga Pub. Television Corp.*, 349 S.W.3d 501, 513-14 (Tenn. Ct. App. 2011) (citing *Wisdom v. Wellmont Health Sys.*, No. E2010-00716-COA-R9-CV, 2010 WL 5093867, at *3 (Tenn. Ct. App. Dec. 10, 2010)). "Illegal activities" are "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3).

TSU contends on appeal that it successfully negated, or submitted proof to show that Mr. Hardy cannot prove, elements (2), (3), and (4) with respect to four specific incidents— purchase of illegal drugs by one night shift supervisor (Koger); misappropriation of funds by the supervisor in charge of special events; the use of state car parts and state equipment on their personal vehicles by two supervisors; and the falsification of time cards by three night shift supervisors (Jones, Koger, Blakely).[19]

---

[18] In his brief, Mr. Hardy states that "the trial court never ruled on whether Appellant had been constructively discharged; yet it is contained in TSU's ruling. . . . For that reason alone this matter should be remanded." This statement is contrary to the record. There was no "TSU ruling"; the Findings and Conclusions prepared by TSU were adopted and made the order of the Court, and it is that order which we review.

[19] In his brief on appeal, Mr. Hardy discusses only the falsification of time cards with respect to Officer Jones; the trial court discussed each incident, as shall we.

23

### i.  Purchase of illegal drugs

TSU cited the following testimony of Mr. Hardy in support of its contention that he could not prove that Officer Koger purchased illegal drugs:

> Q. [H]ow was [Sergeant Koger] involved in illegal activity?
> A. Again, if you're not where you're supposed to be - - if you're on the clock and you're over on Jefferson Street and you're engaged in some activities, buying drugs from somebody, that's not what you're paid to do on the clock. Now I can't get you the names of the people she bought drugs from, but that's not what I'm paid to do.
> Q. So Sergeant Koger was leaving campus to buy drugs while she was on duty?
> A. Not only her.  Yes.
> Q. Other people, too?
> A. Not other people, but Sergeant Koger.  And it's been reported that people who knew her saw her in a police car, buying drugs on duty in uniform.
> Q. Okay.
> A. So I can't confirm any of that.  It's hearsay right now.
> ***
> Q. So let me ask my question again: What if Lieutenant Blakely told Sergeant Koger to go somewhere, would she not be on duty at that point, in your opinion?
> A. Yes.
> Q. If he told her to go somewhere and do something police related - - related to her business at TSU, she would not be on - - she would not be committing an illegal activity?
> A. No, ma'am.
> Q. She wouldn't be?
> A. No.
> Q. Okay.  And how do you know she wasn't?
> A. I don't know that she wasn't.

This testimony does not show that an illegal activity occurred, as contemplated by the TPPA; thus, TSU submitted evidence showing that Mr. Hardy could not establish an essential element of his claim.  The burden then shifted to Mr. Hardy to set forth specific facts showing that there was a genuine issue for trial.  *Hall*, 2015 WL 7281784, at *4-5.  In the materials he filed in opposition to the motion, Mr. Hardy did not submit evidence setting forth any specific facts as to the purchase of illegal drugs.

### ii. Misappropriation of funds

TSU cited the following testimony as evidence that Mr. Hardy cannot prove that any misappropriation took place:

Q. Did you ever see Sergeant Perry's accounting book for the special event?
A. No. I wasn't privy to his accounting books.
Q. Okay, May I see it again? Thank you. And you said that he was found to be doing something - - diverting funds back in 1997. Who - - who - - who found him to be - - you weren't there. You were in the - -
A. No.
Q. - - military, right?
A. No. I was - - year, I was still in the military and I was still in another state.

We agree that this testimony shows that Mr. Hardy cannot prove an essential element of his claim, and the burden thereby shifted to him to set forth specific facts showing a genuine issue for trial with respect to the alleged misappropriation of funds; in the material filed in opposition to the motion he failed to do.

### iii. Personal use of state-owned parts

TSU cited deposition testimony from Mr. Hardy as well as portions of the affidavit of Chief Russell to show that Mr. Hardy could not prove that TSU officers used state-owned equipment for personal use. Mr. Hardy's testimony states, in pertinent part:

Q. Are you saying that Officer Baghi was working on state vehicles for personal gain or other vehicles for personal gain using state supplies?
A. Both. He - - he would work on - - he would buy parts for state vehicles.
Q. Okay.
A. And Officer Baghi is a mechanic.
Q. Okay.
A. And he works on the Ford Crown Victorias. His biggest issue he loves the Crown Victorias so the police department, most of their cars were Crown Victorias. So he would also - - he's a mechanic. He had a little business on the side. He would also buy parts for the department and he would take those parts and use them for his own personal use.
Q. So he would - - he would - - let me make sure I understand it. So he would - - he would take state funds that were supposed to spend on parts for state vehicles and he would buy parts for his own vehicles?
A. And the other way around too, both ways, yes.

25

Q. What do you mean by "both ways?"

A. He would take the funds to buy, let's say a part for a Crown Victoria.

Q. Okay.

A. A state TSU police car. If that part wasn't needed, he would take that part and put it on one of his vehicles that he was working on.

Q. Right.

A. That he had purchased.

Q. Okay.

A. Then if he purchased a vehicle and TSU needed a certain part, he would take that part and put it in the TSU vehicle and he would get reimbursed for it.

***

Q. And how do you know this? How do you know what parts he bought with state funds versus what parts he might have bought on his own?

A. Well, the exact amount of parts I don't know.

Q. Uh-huh.

A. But I know that Chief Russell put out a letter one time saying that Officer Baghi was working on vehicles on his own time.

Q. Uh-huh.

A. And that included access to the shop. I know that at one time the shop foreman got upset. With somebody at TSUPD because they were using the shop without his knowledge. And if you went down there at a certain time on a Friday night or Saturday night and you saw these guys working in the shop and they're like, who told you guys you could be down here and they would say, well, you know, we got permission. So that's from my extent of knowledge.

Q. What's wrong with that?

A. What's wrong with it?

Q. Yes.

A. I don't know. I didn't say anything was wrong with it.

Q. Well, you - - you're putting all of this in this - - in this letter that's a fraud, waste, abuse.

A. If you - - if you are using state property or fund for your own benefit - -

Q. Right.

A. - - it's illegal.

Q. How do you know that he was doing that?

A. Because I was there one time and the cars that he also told us that were fixed, you know, he had to do it on his own time. He really got upset when they wouldn't compensate him, you know, with time anymore.

Q. Uh-huh.

A. So he said, I'm not going to do it.

26

\*\*\*

Q. So - - so - - so he admitted this to you?  That's how you know it?

A. I saw the one vehicle that I was down at the shop one time just to verify something.

Q. Uh-huh.

A. I saw them working on the vehicles.  I saw Sergeant White would come in on his time off in coveralls and there was a vehicle that he had purchased, a black - - a black Ford Taurus or something.  And it's some of the cars the police department buys and they drive.  I saw him come in on his own time because he had already - - his own time schedule and stuff, but he came in to work on the vehicle and he told us that he's going to be, you know, doing some work, but he didn't tell us he was going to be in the shop.  We found out by officers going around, just looking at them down there working.  And it would be late at night sometimes.

Q. Uh-huh.

A. And he was supposed to be off and I don't control his schedule, but this part is from my personal knowledge, and then Chief Russell put out a letter one time saying that he was working on vehicles.

The portion of Chief Russell's affidavit relative to this matter states:

> Officer Baghi had mechanical experience and sometimes worked extra hours on cars when he was not on patrol.  This practice was approved by TSU's administration and allowed the police department to have a faster turnaround on repairs.

The evidence submitted by TSU sufficiently establishes that the officers' use of state-owned equipment was approved by the TSU administration and, consequently, was not an illegal activity; the burden again shifted to Mr. Hardy to set forth evidence showing a genuine issue of material fact for trial in this regard.  Mr. Hardy did not submit evidence in opposition to the motion with respect to the alleged illegality of the officer's use of state-owned equipment, and thus failed to meet his burden.

### iv.  Falsifying time cards

TSU cited the following deposition testimony by Mr. Hardy to show that he cannot prove that Sgt. Jones, Lt. Blakely, or Sgt. Coger falsified their time cards:

Q. Who was not at work when they were supposed to be at work?

27

A. Sergeant Koger, Sergeant Jones, and I think that's pretty much it, that I have knowledge of.

Q. So they were falsifying their time card? Is that what you said a minute ago?

A. Well they would come to work, and they would go home or go wherever they hide out. And you wouldn't see them until shift ends in the morning, half-hour before shift.

Q: Were you in charge of these people?

A. No.

Q. How do you know they weren't sent on some errand? Some department errand that they needed to go to?

A. Because they wouldn't answer a radio when we had an accident. We might have needed cover or a supervisor. Or when they did show up, they wouldn't have their gun belts on or their hair would be messed up. You know, like they were sleeping. And they would come out of uniform. And a couple students had caught some of them sleeping in some places. And they would say stuff like: There's officers sleeping on duty. That's why we're not safe. And I just left it at that.

Q. What are the names of the students?

A. I don't know. I don't talk to them.

Q. What officers did they catch sleeping on duty?

A. Sergeant Koger. Sergeant Jones has an office in one of the buildings that he could lock the door or whatever.

Q. Did you ever see any of these people sleeping yourself?

A. Personally?

Q. Yeah.

A. No.

Q. Okay, But you weren't over these people, and you didn't know where they were when they left campus. You just know they weren't on campus when you thought they should be?

A. Not when I thought they should be. During their shift. No.

Specifically, with regard to Sergeant Jones, Mr. Hardy testified as follows:

Q. When he would leave, would he leave in a TSU police car or in his personal car?

A. Sometimes he would take his police car. Because supervisors have their own car that they're assigned. And sometimes he would leave in his own personal car.

***

Q. But you don't know where he was or what he was doing?

28

A. Exactly, I didn't know where he was, no.

As respects Lieutenant Blakely, Mr. Hardy testified:

> Q. So in addition to Sergeant Jones, who was basically falsifying his time card, Lieutenant Blakley [sic] was also falsifying his time card?
> A. I don't know if he had a time card or not. All I know is that Lieutenant Blakley [sic] sometimes was on third shift, but you never saw him.
> Q. Okay.
> A. He was never at work. There had to be a sergeant and lieutenant there and sometimes it was just a sergeant. Sometimes it wasn't a sergeant. It was a corporal. So we know on the shift he would never - - he lives in Clarksville.
> Q. Yeah.
> A. He wouldn't be at work - - we wouldn't see him all week sometimes, and I don't know if he was at training, but this was consistent. He would never be at work.

The testimony shows that Mr. Hardy had no actual knowledge that the employees falsified time cards and, in any event, was not evidence that what he observed was illegal or that any illegal activity occurred, thereby shifting the burden to Mr. Hardy to submit evidence of specific facts that could lead the trier of fact to find in his favor as to this incident. *Hall*, 2015 WL 7281784, at *4-5.

Mr. Hardy identified the following as evidence setting forth specific facts showing a genuine issue for trial: (1) paragraphs 41 through 45 of his affidavit and (2) portions of the deposition testimony of Sergeant Beene and Sergeant White. Paragraphs 41 through 45 of Mr. Hardy's affidavit state the following:

> 41. I was working the night shift and my supervisor was Sgt. Jones. Sgt. Jones was showing up for work and then disappearing from Tennessee State University. St. Jones was having an affair during work hours. During the shifts many times Jones would not answer his radio, indicating that he was not on campus doing his job. On my days off, when Jones was to be on shift as the supervisor I drove past campus and Jones [sic] police car was not there. I then observed his police car going to a house off campus. His vehicle stayed there for hours. I saw him walking a dog.
>
> 42. In June 2008 two supervisors, Sgt. White and Lt. Kizer questioned me as to whether Sgt. Jones, who was having the affair, was on the TSU campus at night. I told them ask me the right questions and I will not lie for him. Kizer

29

and White then told me they knew he was leaving campus. I then confronted Sgt. Jones and told him two supervisors were questioning his whereabouts and I told Sgt. Jones that I was not going to lie for him. I told him if they ask me the right questions I am going to tell them the truth. I made it clear to Jones that I was not going to cover up for him and his affair. Sgt. Jones got very angry and told me he was a supervisor and nobody watched him and he could do whatever he wanted to do. Jones acted very arrogant and intimidating.

43. On June 18, 2008, I was called to attend a meeting. I waited for almost 1 hour while the sergeants, lieutenants, and some corporals were in the room. I was then called into the room and questioned by numerous supervisors about what I had said to Jones and I was called dishonest and Jones got into my face and called me a liar and stated I was causing dissension on the shift and he could no longer work with me. Jones was very angry. No other officer did anything to stop Jones. I started to get out of my seat and Sgt. White made a motion moving his hand across his neck as if someone was being killed or to end this. No one asked Jones what he was doing at night.

44. On June 21, 2008, I sent a memo to Chief Russell claiming I was being retaliated against because of my complaints of discrimination and requesting that the retaliation cease. I told her "[t]he real issue/concerns are night shift Sergeants on duty/campus when they sign documents for pay stating they are present for duty. I suggest asking the members of the shift. It also appears Sgt. Jones has issues with other officers besides me.

45. On June 22, 2008, I received a memo from Chief Russell stating that I made a false statement about a supervisor and "[t]he only intention of committing such an act is to cause dissension and discord….Your behavior is incorrigible and will not be tolerated at this department". I did not make any false statements about my supervisor. I was never questioned by Chief Russell about what was said about Jones, whether Jones was leaving campus to go to his girlfriend's house or if I was making false statements.

The deposition testimony of Sergeant Beene is as follows:

Q. Okay. Did you know whether or not there was any sort of concern about him [Sergeant Jones] not staying on the job on his shift?
A. Oh, yes, ma'am.
Q. Okay. What was the concern that was out there?

30

A. That he wasn't supervising his shift, and he was staying away from his job and going to somebody's house.  I think he was disciplined for that, if I'm not mistaken.

Q. So he actually had a girlfriend; is that what was going on?

A. Oh, yeah.

Q. And everyone knew it, right?

A. Oh, yeah.

Q. And it wasn't just you.  Was is common knowledge down there in the police department?

A. I don't know if it was common knowledge in the police department, but I knew it and several other people knew it.  Yeah, I knew.

Q. Okay.  How did you know it?

A. How did I know it?

Q. Yes.

A. I knew the girl.

The deposition testimony of Sergeant White states the following:

Q. [D]id you tell [Lieutenant Kizer] what you knew, that there's this allegation that Jones is working the night shift and leaving the job to go to his mistress's house?

A. Repeat the question again.

Q. Did you tell Lieutenant Kizer that you have heard an allegation that Jones is leaving the job to go to his mistress's house?

A. I think so.

Q. Okay.  And that was "I think so"; is that correct?

A. Yes.

****

Q. Were you concerned about the allegation that Officer Jones was leaving the job to go to his mistress's house?

A. You say I was concerned as?

In Paragraph 41 of his affidavit Mr. Hardy states that on occasion Sergeant Jones would not answer his radio and that on his days off Mr. Hardy drove by the campus, did not see Sergeant Jones' police car, and observed the car going to a house off campus where it stayed for hours.  The testimony of Sergeants Beene and White attest to a "concern" and an "allegation" regarding Sergeant Jones leaving the job during his shift.

The testimony of Sergeants Beene and White is not probative of any material issue.  The statement in paragraph 41, while evidence that Sergeant Jones was not on campus, is not

31

evidence of an illegal activity. Construing this evidence in the light most favorable to Mr. Hardy, the evidence is insufficient to establish a genuine issue of material fact with respect to this claim.[20] In addition, Mr. Hardy has not cited to any portion of the record containing a law, regulation, or policy whereby Sergeant Jones' alleged activity would constitute illegality within the meaning of the TPPA.

As explained above, with respect to each of the four incidents which are the basis of Mr. Hardy's TPPA claim, he has failed to meet the burden imposed upon him; accordingly, the trial court correctly granted summary judgment to TSU on this claim.[21]

The grant of summary judgment on Mr. Hardy's sex discrimination claim was not appealed and we have affirmed the grant of summary judgment on the claim of constructive discharge under the TPPA. As to the remaining claims, we have determined that the Findings and Conclusions do not comply with Tenn. R. Civ. P. 56.04. The usual procedure would be to remand the case for further consideration; however, this is the second appeal in this case. The judge who rendered the decision no longer holds office, but the record is ample and the issues fully briefed by the parties. In the interest of judicial economy, we will proceed to decide whether summary judgment is appropriate as to the remaining claims. *See Savage v. City of Memphis*, 464 S.W.3d 326, 335 (Tenn. Ct. App. 2015) (citing *Smith v. UHS of Lakeside, Inc*., 439 S.W.3d 303, 314 (Tenn. 2014)).

## C. Summary Judgment on the Remaining Claims

### 1) *Retaliation under Title VII the Civil Rights Act of 1964 and the Tennessee Human Rights Act, Tenn. Code Ann. §§ 4-21-101 and 4-21-301*

In order to establish a prima facie case of retaliation under Title VII and the Tennessee Human Rights Act, Tenn. Code Ann. §§ 4-21-101 and 4-21-301, the plaintiff must show (1) he or she engaged in protected activity; (2) the employer knew of the exercise of the

---

[20] The evidence does not raise any issue as to whether Lieutenant Blakely or Sergeant Koger falsified their time cards or engaged in any illegal activity.

[21] In light of our holding that the court properly granted summary judgment on the TPPA claim because the second element was negated, it is not necessary to address the remaining elements. Mr. Hardy also argues that the trial court erred in finding that Sergeant Jones' testimony was "almost incomprehensible," contending that the finding was against the weight of the evidence and violated Tenn. R. Civ. P. 56 by resolving disputed issues of fact. In light of our holding that Mr. Hardy cannot prove that Sergeant Jones was engaged in an illegal activity and that TSU was entitled to judgment as a matter of law with respect to Mr. Hardy's TPPA claim, the trial court's characterization of Sergeant Jones' testimony is not determinative and we do not address this issue. See footnote 4, *supra*.

protected right; (3) an adverse employment action was subsequently taken against the employee; and (4) a causal connection between the protected activity and the adverse employment action. *See Hawkins v. Anheuser-Busch, Inc*., 517 F.3d 321, 345 (6th Cir., 2008); *Ferguson v. Middle Tennessee State Univ*., 451 S.W.3d 375, 382 (Tenn. 2014). As noted earlier, Mr. Hardy filed a complaint of discrimination with TSU's Equity, Diversity and Compliance Office on October 30, 2007, and a charge of discrimination with the EEOC on or about March 17, 2008. TSU identified seven acts, detailed *supra* at Section II A 2, which he alleged constituted retaliatory conduct; TSU contended that the material filed in support of the motion negated essential elements of a claim of retaliation or showed that Mr. Hardy could not prove an essential element of the claim.

### i. *Denial of promotion to Lieutenant*

TSU contended at the trial court and on appeal that the denial of the promotion to Lieutenant had no causal connection to the discrimination complaint filed on October 30, 2007, because the decision pre-dated the complaint and because Mr. Hardy was not qualified for the position. In support of its contention, TSU relied upon affidavits of Chief Russell and Linda Spears. Chief Russell's affidavit states, in pertinent part:

> After receiving applications for the lieutenant position, I submitted a list of candidates to be interviewed for the position. Officer Hardy was not on the list. I did not consider Officer Hardy qualified for the lieutenant position because he had no experience as a supervisory police officer in a civilian setting. The person who was hired was also an African American male of approximately the same age; he had years of supervisory police experience in a civilian setting.

Attached as Exhibit 11 to Linda Spears' affidavit was the appointment recommendation form for the Lieutenant position, identifying Tony Blakely as the recommended candidate. The form recites that the position was opened in June 2007, posted on August 22, closed September 15, that Chief Russell submitted the list of candidates to be interviewed on September 26, that the candidates were interviewed between October 2 and October 10, and the recommended candidate was submitted to Human Resources on October 12.

The chronology of the selection process for the lieutenant position shows that the decision as to who would fill the position was made prior to Mr. Hardy's complaint being filed. In addition, Chief Russell's affidavit states that Mr. Hardy was not qualified for the position. This evidence negates the causal connection element of a retaliation claim and shifted the burden to Mr. Hardy to respond with affidavits or other evidence setting forth specific facts showing a genuine issue for trial.

In neither his response to TSU's motion in the trial court nor his brief on appeal does Mr. Hardy direct the court to specific evidence in the record setting forth facts showing a genuine issue for trial relative to the lieutenant position. We have identified the following evidence pertinent to this issue from our review of the record: (1) The statement in Mr. Hardy's affidavit that "I applied for the lieutenant's position and was not even interviewed. Chief Russell told me as long as she was there I would never be promoted"; and (2) paragraphs 58, 59, 60 and 61 of Mr. Hardy's response to TSU's statement of material facts.[22]

The material submitted by Mr. Hardy does not address the chronology of the selection process, particularly the fact that the selection was made prior to the date Mr. Hardy filed his complaint; further the material does not address his qualifications for the position. His submission fails to establish a genuine issue of fact as to the causal connection between his complaint and the selection for the lieutenant position. The court properly granted summary judgment to TSU on this claim.

### ii.   Denial of promotion to Sergeant

TSU contends that Mr. Hardy cannot prove a causal link between the denial of the promotion to sergeant and his retaliation claim because he did not complete the necessary paperwork to be considered for the position. As evidence, TSU relied upon Chief Russell's affidavit, in which she stated:

> Part of the application process for the sergeant position was the completion of an interview questionnaire which was to be completed by each applicant under

---

[22] Paragraphs 58, 59, 60 and 61 state as follows:

58.     After receiving applications for the lieutenant position, Chief Russell submitted a list of candidates to be interviewed for the position on September 26, 2007.
          RESPONSE:  Admitted.  Denied any inference this was not retaliatory.  Plaintiff applied for the Lieutenant's position and was not been interviewed.  Chief Russell told Plaintiff so long as she was there he would never be promoted.

59.     Mr. Hardy was not on the list because Chief Russell did not believe he was qualified.
          RESPONSE:  Denied.  Chief Russell told Plaintiff so long as she was there he would never be promoted.

60.     Chief Russell testified that she did not consider Mr. Hardy qualified for the position because he had no experience as a supervisory police officer in a civilian setting.
          RESPONSE:  Denied.  Chief Russell told Plaintiff so long as she was there he would never be promoted.

61.     The person who was hired was also an African American male of approximately the same age; he had years of supervisory police experience in a civilian setting.
          RESPONSE:  Denied.  Chief Russell told Plaintiff so long as she was there he would never be promoted.

a monitoring proctor. The questionnaire presented applicants with a variety of topical questions relating to leadership roles, police work, and ethics, as well as common police scenarios asking for a response. Reading the responses to the questionnaire was an important tool to evaluate candidates. Officer Hardy did not complete the interview questionnaire and was therefore not considered for the position.

This evidence negates the causal connection element of the retaliation claim, thereby shifting the burden to Mr. Hardy to introduce evidence showing a genuine issue of material fact.

In neither his response to TSU's motion in the trial court nor his brief on appeal did Mr. Hardy direct the court to specific evidence setting forth facts showing a genuine issue for trial relative to the sergeant position. Upon our review, we have identified the following paragraphs from Mr. Hardy's response to TSU's statement of material facts which pertain to the promotion:

> 62. Mr. Hardy claims that he applied for the position of sergeant in January of 2008 and was denied the promotion. (Hardy Dep. p. 229-230).
> Response: Admitted.
>
> 63. Part of the application process was the completion of an interview questionnaire which was to be completed by each applicant under a monitoring proctor. (Aff. Russell).
> Response: Admitted.
>
> 64. The questionnaire presented applicants with a variety of topical questions relating to leadership roles, police work, and ethics, as well as common police scenarios asking for a response; reading the responses to the questionnaire was an important tool to evaluate candidates. (Aff. Russell).
> Response: Admitted.
>
> 65. Mr. Hardy did not complete the interview questionnaire and was therefore not considered for the position. (Aff. Russell).
> Response: Denied. Chief Russell told Plaintiff so long as she was there he would never be promoted. (Ex. 1; Hardy Aff. ¶86). Plaintiff was to be a little bit late to take the questionnaire and was then denied the right to take the questionnaire. (Ex. 1; Hardy Aff. ¶87).

Pertinent to this issue, Mr. Hardy's affidavit states "I applied for a Sergeant's position. I was to be a little bit late to respond to the questionnaire and was not allowed to take the questionnaire."

In both the affidavit and the response to the statement of material facts Mr. Hardy acknowledges that he did not complete the application process for the sergeant position. Taken in the light most favorable to Mr. Hardy this evidence does not raise an issue of material fact as to the causal connection between the complaint he filed and the selection for the sergeant position.

### iii. Warning for Failure to Follow a Direct Order

TSU contends that there was not a causal connection between the filing of Mr. Hardy's complaint and a verbal reprimand that he received for failure to follow the order of a supervisor; TSU argues that the reprimand was justified and, in any event, was not a materially adverse action because his performance evaluation was not affected by the reprimand. In support of its contention, TSU submitted the affidavit of Lieutenant Blakely which stated:

> In March of 2008, Officer Hardy returned evidence to a suspect after a panty raid. As returning evidence to a suspect is a violation of police procedures, Sergeant Jones, the officer in the chain of command between me and Officer Hardy, ordered Mr. Hardy to supplement his report to explain why he has returned evidence to a perpetrator. I was in a nearby office and overheard the order. I heard Officer Hardy refuse to obey and argue with Sergeant Jones. I reprimanded Officer Hardy for failing to follow an order.

TSU also submitted Mr. Hardy's performance evaluations for the seven month period ending June 2007 and the period January 2008-June 2008; the evaluations include numerical ratings from 1 to 5 for the employee's behavioral standards and job performance.[23] With respect to the behavioral standards, three factors are measured: collaborative working relationships/team building, customer service and empowered user approach, and professional attitude. With respect to job performance, job knowledge and competence, productivity and quality of work, judgment/decisionmaking/problem solving ability, and communication are measured. On both of Mr. Hardy's evaluations, he is rated 3 in all areas; there is no reference to the verbal reprimand in the 2008 evaluation.

---

[23]The numerical measurements are: 1=unsatisfactory, 2=marginal, 3=competent, 4=exceptional, and 5=superior.

36

Lieutenant Blakely's affidavit and the performance evaluations are evidence that the verbal reprimand was justified and was not a materially adverse action, thereby shifting the burden to Mr. Hardy to show that a genuine issue of fact existed as to whether the reprimand adversely affected his employment.

With respect to this incident, at the trial court and on appeal, Mr. Hardy states that he "was written up for trite matters such as giving back panties to a male student during a panty raid and/or refusing to give a statement, when he did give two statements about the event." He then cites to paragraphs 31 and 32 of his affidavit, along with the report of the incident and an email sent to him by Lieutenant Blakely.[24]

---

[24] Paragraphs 31 and 32 of Mr. Hardy's affidavit state:

> 31.     On March 24, 2008, I was the cover officer on the scene of a panty raid with another officer, Boskent. I returned underwear lawfully given to the apprehended male student back to the male student at the end of the investigation. The underwear had no evidentiary value. I already had a statement from the male student admitting what he did and that the underwear had been given to him. I provided an official police report of the incident and returned the report to my supervisor Sgt. Jones. The next day 3/25/2008 I was contacted by Sergeant Jones to write a statement about my actions concerning the return of the underwear. St. Jones told me Chief Russell ordered him to make me write the statement. The other officer on the scene did not have to do this. I wrote the statement. My first statement was in my police report.

> 32.     On March 28, 2008, I was confronted by Lt. Blakely that he heard me state I was not going to give a statement. This was not true and I provided my statement and also told him my statement was also contained in the police report that I wrote. Lt. Blakely gave me a verbal warning for insubordination for my conversation with Sgt. Jones. Sgt. Jones did not write me up. Lt. Blakely was not even in the same room when this conversation occurred.

The police report consists of a three page report prepared by Officer Boskent, a copy of the citation issued to the student, the student's written statement, Mr. Hardy's one-page statement.

Lieutenant Blakely's email to Mr. Hardy states:

> Officer Hardy,

> This e-mail serves as documentation for our March 28th, 2008 meeting, regarding insubordination. I'm not going to debate the merits of this incident; however your statement will be accompanied with this letter. In short, you will adhere to the lawful orders of the supervisor. You only have the right to refuse an order that is in violation of the law. I appreciate you reflecting upon your supervisor's authority and going back and providing a statement.

37

The evidence relied upon by Mr. Hardy, taken in the light most favorable to him, does not address the contention that the verbal warning he received was not a materially adverse action; indeed, it does not explain what, if any, consequence there was to the verbal warning. In the absence of such evidence, TSU was entitled to judgment as a matter of law as to this incident. *See Reigner v. Metro. Gov't of Nashville, No. M2014-02450-COA-R3-CV, 2006 WL 1328937 (Tenn. Ct. App. May 11, 2006).*[25]

### iv. *Warning for Improper Notice of Absence*

Similarly, TSU argues that a verbal warning Mr. Hardy received for improper notice of absence was not a materially adverse action and there was no causal connection with the discrimination complaint because the warning was warranted in light of his failure to follow the proper notification procedure. In support of its contention, TSU relies upon Mr. Hardy's 2007 and 2008 performance evaluations and a portion of the affidavit of Chief Russell, which states:

> Officer Hardy did receive a verbal warning for failing to follow the proper procedure for notifying his supervisor of an absence. It is the mission of the TSU Police Department to provide security to TSU's campus; thus, the police force must be fully staffed at all times day and night. The supervisor must know of an absence as soon as possible so that arrangements can be made to find a replacement.
>
> The purpose of personally contacting the supervisor to report an absence is to assure that the employee actually notifies the supervisor. A telephone call accomplishes this goal. The proper procedure was to contact the supervisor and the dispatcher so that a replacement could be contacted as soon as possible. In 2008, text messaging was not as prevalent as it is today so its reliability as a system of notification in a police environment was not certain and had yet to be addressed.

This evidence supports TSU's contention that there was not a causal link between the warning in question and the filing of Mr. Hardy's EEOC charge because the verbal

---

[25] In *Riegner* this court was tasked with determining "whether a transfer with no loss of pay, rank or benefits is an adverse employment action for purposes of establishing retaliation under the THRA." 2006 WL 1328937 at *5. We adopted the standard set forth in *Barnes v. Goodyear Tire and Rubber Co.*, 48 S.W.3d 698, 707 (Tenn. 2000), applicable to suits brought under the Tennessee Handicap Discrimination Act, that this element of a retaliation claim requires a "material and adverse change in the terms and conditions of employment."

reprimand was warranted and that the warning was not a material adverse action. Thus the burden shifted to Mr. Hardy to put forth evidence to show a genuine issue of material fact.

To satisfy his burden, Mr. Hardy relied upon deposition testimony of Chief Russell and Officer Frank White and paragraph 47 of Mr. Hardy's affidavit.[26]

---

[26] Chief Russell testified as follows:

> Q. Did you have any sort of rule or regulation that the officers could not communicate by cell phone?
> A. During that time, I believe that's when texting first started, our policy was to call into the officer and contact the supervisor by phone if you're not coming in.
> Q. Was that a written policy?
> A. To contact the supervisor, yes, that was long-standing policy. That was before texting and all that began.
> Q. Was there a written policy that you could not use texting to contact your supervisor?
> A. No.
> Q. Do you know whether or not some of the officers under you had the capabilities and knowledge to text or not to text?
> A. No, I don't know that.
> Q. Was there a -- did you ever have any meetings where you told the officers you cannot text?
> A. Again, that was when texting first began. I don't know if they were texting or not. The policies at Tennessee State University were written way before all of that, so that's not something that would have been -- something that you would have included, because it was policy before people started doing that.
> Q. Did you ever have any meetings with any of the police officers then to say "no texting"?
> A. Not that I remember.
> Q. And the policy was, if you had to call out sick, the officer had to contact who?
> A. The supervisor.
> Q. Okay.
> A. And the dispatcher.

Officer White testified as follows:

> Q. Okay. Now, how do you communicate – if you're down at the downtown campus, how do you communicate with the main campus?
> A. Most the time through the radio.
> Q. Through the radio. Did you ever use cell phones?
> A. Yeah, one time we did have phones.
> Q. Okay. Were you issued a phone?
> A. At one time, yes.
> Q. Okay. Can you – could you use – are you familiar with text messaging?
> A. I don't text.
> Q. Okay. Do you know whether or not there was any prohibition put on text messaging?
> A. Never heard of it.
> Q. Okay. Now, if there was any change to a policy at TSU, how do you find out about it?

39

The evidence submitted by Mr. Hardy shows that he did not violate an express policy or departmental protocol by notifying his supervising officer of his absence by text message. Rather, the evidence shows that he contacted both his supervising officer and the dispatcher; the point of contention was whether texting was an acceptable method of contact. In any event, however, the evidence does not address the contention that the verbal warning he received was not a materially adverse action; as with the warning he received for failing to follow a direct order, he does not assert that there was a material and adverse change in the terms and conditions of his employment. Accordingly, summary judgment was appropriate on this claim.

### v. *Denial of request for leave in 2008*

With respect to Mr. Hardy's contention that he was retaliated against because a request for annual leave he made in 2008 was not approved, TSU responds that Mr. Hardy suffered no material adverse action because his request for annual leave was approved. Relative to this incident TSU submitted the following: (1) a copy of Mr. Hardy's leave request form signed by him on May 27, 2008, which shows that he requested leave for a continuous period beginning from July 25 through August 4; the form was marked "disproved" by Sergeant Koger on June 23, with the notation "will approve 7 days or less due to shift shortage cannot approve 9 days."; (2) the affidavit of Linda Spears, which states that Mr. Hardy "took annual leave from July 25, 2008 to July 29, 2008, did not work on July 30 and 31, and took annual leave from August 1 to August 5, and did not work August 6 and 7." This evidence shows that, while Mr. Hardy's initial request for nine continuous days off was denied due to a shift shortage, he did receive nine days off within thirteen days. Under these facts, the denial of his request was not an adverse employment action, and the burden shifted to Mr. Hardy to introduce evidence establishing a genuine issue of fact that the denial was an adverse employment action.

---

> A. Either you get called in or the lieutenant would come out there and tell me something about it, I guess.
> Q. Okay. And did you ever hear any changes to policies about not being able to text message?
> A. You're the first to tell me about [portion omitted].

Paragraph 47 of Mr. Hardy's affidavit states:

> On June 23, 2008, I was disciplined with a verbal warning for using text messaging to communicate with my supervisor that I could not make it to work because I was sick. My supervisor would not answer her telephone so I thought it best to send a text message. I also contacted the dispatcher by telephone. I followed the policy of my department in doing such and neither the policy nor TSU ever stated that I could not communicate by use of text messaging.

40

In neither his response in opposition to the motion for summary judgment filed in the trial court nor in his brief on appeal does Mr. Hardy cite to evidence establishing an issue of fact with respect to this incident and we have failed to discern any such evidence in our review of the record. TSU was entitled to judgment as a matter of law with respect to this matter.

### *vi. Transfer to downtown campus*

In his deposition and in a "Memorandum For Record" dated September 27, 2009, Mr. Hardy asserted that his transfer from the main campus to the Avon Williams campus resulted in a change in the hours he worked at TSU and conflicted with those he worked at his other employment at DCS; he contended that this was a materially adverse action taken in retaliation for filing charges with the EEOC. In the trial court, TSU contended that Mr. Hardy was barred from claiming that the shift change was a material adverse action because he was violating the law by maintaining two state jobs; that Chief Russell was not aware of the conflict in his work hours between the TSU and DCS jobs at the time she made the transfer and subsequent change in the work hours for all police officers at the downtown campus; and that the adverse action Mr. Hardy experienced was, in fact, a shift change at DCS. On appeal, TSU argues that the transfer was not a material change because it did not involve a change in pay, fringe benefits or his status as a commissioned police officer and that there was "no problem until DCS changed Plaintiff's schedule a year later"; TSU also contends that Mr. Hardy did not complain about the transfer.

As proof that the transfer was not an adverse action, TSU relied upon testimony in the depositions of Mr. Hardy and Chief Russell, as well as the affidavits of Chief Russell, Linda Spears, and Tonya Christenson, DCS Team Coordinator. In her deposition, Chief Russell testified as follows:

> Q. You're telling me under oath that you did not know Mr. Hardy was working another job when he was transferred to the Avon Williams campus, correct?
> A. DCS. I did not know he was working for DCS.
> Q. Did you know he was working another job?
> A. I didn't know what he was doing. I didn't see Mr. Hardy.

Chief Russell's affidavit stated:

> In August of 2008, the third shift at the downtown campus was eliminated so Officer Hardy was placed on the second shift with working hours from 3:00 p.m. to 11:00 p.m. As there are no residential facilities at the downtown

campus, TSU decided to eliminate the third shift at the downtown campus as unnecessary.

\*\*\*

I did not know Officer Hardy worked at the Department of Children's Services until after he was transferred to the downtown campus. I did not know what Officer Hardy's shift at the Department of Children's Services was.

In the deposition testimony cited by TSU, Mr. Hardy acknowledged that he was working two state jobs; discussed the priority he assigned between the two jobs; and acknowledged that he had no change in pay or benefits. In her affidavit, Ms. Spears reported four incidents in which Mr. Hardy falsified his time cards. Ms. Christenson's affidavit stated that an investigation of Mr. Hardy was initiated after his DCS supervisor saw him working at TSU while on call for DCS; that his dual employment had not been approved by DCS and that he was disciplined and asked to resign from one of the jobs. On appeal, TSU cites additional deposition testimony of Mr. Hardy in support of its contention that the transfer was not a materially adverse action.[27]

---

[27] Mr. Hardy testified:

Q. Did you consider the job at the Avon Williams campus to be harder or just different?
A. I considered the job -- even sending me down there -- to be a punishment.
Q. Okay.
A. To get me away from main campus so nobody could talk to me; so nobody would have to deal with me. Because I was causing alleged dissension and lying on supervisors, I felt that was a punishment that I was being sent down there for.
Q. And aside from that, I'm talking about your duties, though. Was there something about your duties -- your actual duties that was not as enjoyable or harder than your duties at the main campus?
A. No.
Q. Did you get paid less?
A. No.
Q. Benefits cut? Any benefits cut or reduced or anything like that?
A. No.
\*\*\*\*
Q. Exhibit 68, is that your 2009 evaluation?
A. Yes.
Q. Okay. Did you actually go up in your performance categories from your previous evaluations?
A. In some areas it looks like it's above. In one area it looks like it's below. So without looking at the other, I couldn't tell you.

From our review of the foregoing, the only evidence that the transfer was not a material adverse action was the acknowledgement that Mr. Hardy suffered no reduction in pay or benefits as a result of the transfer; the other evidence either shows the reason for the transfer and scheduling changes or matters occurring after the transfer.[28] The burden thus shifted to Mr. Hardy to show facts which demonstrated a genuine issue of fact that the transfer was a material adverse employment action.

Mr. Hardy contends that the transfer to TSU's downtown campus was a materially adverse action because he was demoted; his patrol car was taken away and he was put on foot patrol; he had contact with few students; and that he was the only officer on the night shift. In support of his claim, Mr. Hardy cited his own affidavit; deposition testimony of Sergeant White; deposition testimony of Linda Spears; a letter from Chief Russell to Tracy Carter, Assistant Director of Equity, Diversity, and Compliance; a memorandum from Chief Russell to Linda Atkins, Chief of Staff and University Counsel; Sandra Keith, Director of Equity, Diversity and Compliance; and Linda Spears; and an email from Chief Russell to Tracy Carter. Mr. Hardy's affidavit stated:

> 51. I was demoted when I was switched to the downtown campus. Downtown has less students. It was commonly acknowledged that TSU would send the difficult and problem officers to the downtown campus. My police car was taken away from me. On the downtown campus I was only on foot patrol. I was in contact with few students. I felt as if I was a security guard instead of a police officer. Some officers there, like Officer Teague, did not even have a gun. I spent many an hour walking the hallways and the parking lot, encountering few people.

> 52. When I was transferred to the Avon Williams campus I was the only officer working the night shift. It was my understanding that I was not replacing anyone. No one had worked the night shift at Avon Williams. I had

---

[28] As this court noted in *Frye v. St. Thomas Health Servs.*:

> An adverse employment action is "a material and adverse change in the terms and conditions of employment." *Barnes v. Goodyear Tire and Rubber Co.,* 48 S.W.3d 698, 707 (Tenn. 2000). "The change must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Barnes,* 48 S.W.3d at 707. The Tennessee Supreme Court has provided a non-exhaustive list of adverse employment actions including: "termination of employment; demotion evidenced by a decrease in wage or salary, by a less distinguished title, or by a material loss of employment benefits; or a significant reduction of material responsibilities." *Barnes,* 48 S.W.3d at 707.

*Frye,* 227 S.W.3d 595, 610.

to walk around an empty building and then the parking lot. Not much happened and I spent many hours just walking. I also watched a security camera.

The deposition testimony of Linda Spears stated:

> Q. [W]hat is your understanding about what an employer can do or can't do in terms of --
> A. If people --
> Q. -- retaliation?
> A. If people file a complaint or -- about something, that their job status should not be impacted, basically.
> Q. Okay. And job status, does that mean in terms of any sort of negative action like a transfer?
> A. That could fall under there. It could.

The letter from Chief Russell to Tracy Carter, dated March 16, 2008, stated the following:

> My resolution to the complaint is to reduce Mr. Hardy to a security officer 1 position. In this capacity he can be responsible for watching security cameras and securing buildings. He will not carry a firearm thus ending his responsibility to report to training and he can be off on the days he is requesting a special accommodation. Anything else would result in no one working the 3pm to 11pm shift or the 11pm to 7am shift…This change will result in a reduction of pay but it will not interfere with the mission of the police department. Catering to Mr. Hardy would cause a problem with completing the responsibilities of the police department.

The memorandum from Chief Russell to Linda Atkins, Sandra Keith, and Linda Spears, dated June 25, 2008, stated:

> I am requesting a meeting between you, Dr. Michael Freeman, Vice President for Student Affairs and me in reference to Kenneth Hardy. Kenneth Hardy is employed as a police officer 1 with the Tennessee State University Police Department. He has filed an EEOC complaint against me but, he has increasingly caused dissension, disturbance and confusion in the work unit that he is assigned too [sic]. His latest infraction involved lying on supervisors. The supervisors reacted appropriately to this incident and resolved it at their level. However, Mr. Hardy has made it difficult to supervise him and maintain a working relationship with the supervisors in the department. I have sent

44

information to Dr. Freeman regarding his behavior and my response to it. I have requested his consideration for terminating Mr. Hardy's employment. Dr. Freeman suggested that a meeting be convened between us to determine if there are any legal or procedural aspects that would prohibit the termination of Mr. Hardy due to his EEOC complaint.

Lastly, Chief Russell's email to Tracy Carter on July 1, 2008 stated:

Hi Tracey,
I will reply to this as soon as I get an opportunity. Anyway, I have to do something with Hardy. He is causing too many problems and now he is telling other officers that he will have Lt. Blakely's badge and all sorts of stuff. Can I assign him to the AWC for his duty station until this is resolved? The sergeants are at wits end and he is just getting completely out of control. He told another lie on Sgt. Jones and it is getting really unbearable for him. There must be something that can be done. He is just causing too much problem. Let me know what I can do.

Mr. Hardy's affidavit details the qualitative differences between the work he did at the downtown campus and that on the main campus; these are sufficient to suggest that the transfer was a materially adverse action and could lead a rational trier of fact to find in his favor. The other evidence, particularly the tone and tenor of Chief Russell's messages, are evidence of a retaliatory motive in transferring him to the downtown campus. Taken in the light most favorable to him, the evidence he submitted satisfies his burden to raise a genuine issue of material fact and preclude summary judgment on this issue. *See Regnier*, 2006 WL 1328937, at *12 (holding that "the question of whether of [sic] not the transfer of Sergeant Regnier was an adverse employment action was a question of fact for the jury). Accordingly, TSU was not entitled to judgment as a matter of law.[29]

### vii. Multiple warnings for tardiness

TSU contends that there was no causal link between Mr. Hardy filing a charge with the EEOC or reporting any illegal activity and the warnings he received for being late to his shift. In support of this contention, TSU cited the following: (1) an oral warning for tardiness/failure to notify supervisor memorialized in an August 12, 2009, memorandum to

---

[29] Mr. Hardy submitted additional portions of his affidavit as well as the deposition testimony of Sergeant White in response to TSU's contention that Mr. Hardy had no issues with his shift change at TSU until his schedule at DCS changed. In light of our holding that TSU was not entitled to summary judgment on this retaliation claim, we do not reach this argument.

him from Sergeant White; (2) a written warning for tardiness/failure to notify supervisor dated August 17, 2009, he received from Lieutenant Kizer; (3) a memorandum dated August 19, 2009, addressed to Mr. Hardy from Chief Russell; (4) a written warning "regarding tardiness to duty" dated September 27, 2009, he received from Sergeant White; (5) Mr. Hardy's resignation letter; and (6) excerpts from Mr. Hardy's deposition where he discusses the warnings he received.

This evidence shows that Mr. Hardy received the oral and written warnings for tardiness and that he acknowledged being tardy on the dates in question; it is evidence that negates the causal connection element of a claim of retaliation, thereby shifting the burden to Mr. Hardy to produce evidence showing an issue for trial.

In response to TSU's motion, Mr. Hardy cited to 50, 58, 61, 64, 65, 66, and 68 of his affidavit and portions of Sergeant White's deposition. Mr. Hardy's affidavit states:

> 50. On July 1, 2008, Chief Russell moved me to the downtown campus to report to a different supervisor. Chief Russell stated this was being done because I had caused dissension on my shift and had lied on my supervisors. No action was taken at this time against Sgt. Jones, the officer having the affair during work hours. I spoke with Lt. Beene about working under him on the main campus. He told me he did not have any problem making an accommodation for me to allow me to be late on some days. Lt. Beene later told me he asked Chief Russell if he could do this and was told no. I did not want to go to the downtown campus.
>
> ***
>
> 58. I told Sgt. White of my DCS hours and he told me just to call him and he could accommodate me if I was late. I did this and there was no problem. I called both White and the dispatcher.
>
> ***
>
> 61. After I got my evaluation on June 2009, I told Lt. Beene of both of my jobs and the timing issue. He told me he still would like for me to work under him and that he could accommodate me if I were late. Lt. Kizer, Sgt. White and Lt. Beene all told me Lt. Beene had asked that I be allow to work with him and he was told no. Lt. Beene told me that Lt. Kizer and Chief Russell had told him I could not move to his shift.
>
> ***

46

64.     In August-September 2009, Sergeant White told me Lt. Kizer told him he could not allow me to be late anymore. Sgt. White told me he did not have any problem with me coming in late. Sgt. White told me that I was a good officer and he had no problem with me being late on occasion and he could accommodate me. Sgt. White told me Lt. Kizer stated Chief Russell told him he had to write me up for being late.

65.     On August 12, 2009 I received an oral warning for being late on August 11, 2009.

66.     On August 17, 2009 I received a written warning for being late.

\*\*\*

68.     On August 17, 2009 I sent a memorandum to Lt. Kizer in response to my warning for being late. I told him that I was hired to work the night shift and did not chose to work the 3-11 shift but was reassigned this shift by Chief Russell. I requested to be reassigned to a different shift. I never received any reply back about my request to change shifts.

In his deposition Sergeant White testified that Mr. Hardy was late on occasion, and that he accommodated Mr. Hardy and proposed options to him until his supervisors told him he could not.

Taken in the light most favorable to Mr. Hardy, this evidence shows that his direct supervisor was willing to accommodate his late schedule prior to receiving orders from Chief Russell and Lieutenant Kizer prohibiting him from making concessions for Mr. Hardy's schedule, and that Mr. Hardy was given no opportunity to change his schedule after being transferred to a different shift. The trier of fact could find that the scrutiny of Mr. Hardy and the warnings he received was causally related to the EEOC charges he filed. Accordingly, TSU was not entitled to summary judgment on this claim of retaliation.

### 2) *Hostile Work Environment and Constructive Discharge Under Title VII of the Civil Rights Act of 1964 and the Tennessee Human Rights Act*

Mr. Hardy alleged that he was subjected to a hostile work environment and was constructively discharged in violation of Title VII and the Tennessee Human Rights Act. The trial court treated these claims together; its disposition of the claim is discussed in Section II A 3, *supra*.

47

### i. Hostile Work Environment

In *Frye v. St. Thomas Health Services*, we noted the following with respect to claims of a hostile work environment:

> Under the THRA, "[i]t is a discriminatory practice for an employer to ... discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's ... age." Tenn.Code Ann. § 4-21-401(a)(1). The Tennessee Supreme Court has recognized that the legislature's stated purpose in codifying the THRA was to prohibit discrimination in a manner consistent with the Federal Civil Rights Acts of 1964, 1968, and 1972. Tenn. Code Ann. § 4-21-101(a)(1). Accordingly, our analysis of Plaintiffs' hostile work environment claim is the same under both the THRA and Title VII of the Civil Rights Act. *Campbell v. Fla. Steel Corp.,* 919 S.W.2d 26, 31 (Tenn. 1996).
>
> The United States Supreme Court has interpreted Title VII of the Civil Rights Act of 1964 as protecting individuals against hostile work environments. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (U.S.1986). To establish a hostile work environment claim, a plaintiff must show that (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment must have been based on a protected characteristic of the employee, such as age; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such an environment under either a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002). A hostile work environment claim is established upon proof of conduct that is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Meritor Sav. Bank, FSB,* 477 U.S. at 67, 106 S.Ct. 2399 (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)).

*Frye* 227 S.W.3d at 602. Our Supreme Court has held that a hostile work environment occurs "where conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Campbell v. Florida Steel Corp*., 919 S.W.2d 26, 31 (Tenn. 1996) (quoting *Meritor*, 477 U.S. at 65, 106 S. Ct. at 2404)). In determining whether an environment is hostile, a court looks to the totality of the circumstances, which may include the following considerations: "the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating; or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance; and the employee's psychological well-being." *Campbell*, 919 S.W.2d at 32.

TSU contended that it was entitled to summary judgment on the hostile work environment claim because: (1) Mr. Hardy did not make a claim of hostile work environment in his charges of discrimination; (2) he did not identify any harassment based on sex;[30] (3) the harassment was not pervasive or severe; and (4) he could not prove a tangible employment action. In its brief on appeal, in addition to arguing that Mr. Hardy cannot prove severe or pervasive harassment, TSU argues that Mr. Hardy's hostile work environment claim fails because (1) there is no causal connection between any alleged harassment and Mr. Hardy's resignation[31] and (2) Mr. Hardy has no proof of intolerable conditions.

Citing the EEOC charges that Mr. Hardy filed, TSU asserted that the hostile work environment claim should be dismissed because Mr. Hardy did not make the claim in his charges of discrimination.[32] In addition, TSU argued that any harassment Mr. Hardy received was not severe or pervasive and that a tangible employment action did not occur;

---

[30] TSU identified the following testimony from Mr. Hardy with respect to its contention that he did not identify any harassment based on sex:

> Q: Have you ever heard anybody in a supervisory position at TSU make any disparaging comments about your gender?
> A: No.
> Q: Were you exposed to any conversation, jokes, emails, posters that made fun of you [sic] gender?
> A: No.

In his response to the motion, Mr. Hardy argued that TSU incorrectly characterized his hostile work environment claim as a claim based on sex as opposed to retaliation. In its reply, TSU stated only: "In the face of absolutely no proof of a hostile work environment based on sex, Plaintiff argues that he endured a hostile work environment based on retaliation, which is essentially just another way of claiming retaliation. Plaintiff's complaints of retaliation have been addressed. Defendants are entitled to summary judgment." We agree with Mr. Hardy that TSU mischaracterized his claim in its motion and the materials filed relative thereto. Neither party on appeal argues that the hostile work environment claim is related to sex discrimination.

[31] This argument relied on the affidavit of Tonya Christenson; we shall discuss this evidence in our discussion of the constructive discharge claim.

[32] The court did not dismiss the Title VII claim on this basis, and neither party raises this as an issue on appeal. As long as a plaintiff alleges facts sufficient to put a defendant on notice of the claim, failure to "check the appropriate box on the EEOC's complaint form" will not preclude the plaintiff from bringing suit as to that claim. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 490 (6th. Cir. 2010).

49

TSU did not cite to the record for evidentiary support for this argument. On appeal, TSU also cites to portions of Mr. Hardy's deposition testimony as evidence that Mr. Hardy cannot prove that he experienced intolerable working conditions.[33]

In the deposition testimony Mr. Hardy discussed an abbreviated meeting he had with his superiors in which he alleged he was yelled at by Sergeant Jones, his work responsibilities on the downtown campus, and his performance evaluations. This evidence, without more, is insufficient to establish that the harassment was sufficiently severe or pervasive to alter the terms and conditions of Mr. Hardy's employment; the burden was thereupon shifted to Mr. Hardy to cite to specific evidence of additional acts, events, or conduct which would constitute a discriminatorily abusive working environment.

In his brief on appeal, relative to his hostile work environment claim, Mr. Hardy argues that "all of the actions of Chief Russell, i.e. her requests to fire and demote him, her transfer of him to a shift he would have trouble working, writing him up for trivial matters and labeling him as a troublemaker constitute a hostile work environment." While he has not included citations to the record, as required by Tenn. R. App. P. 27, we are aware of the evidentiary support from our earlier discussion of these matters. Construing in Mr. Hardy's favor the evidence of circumstances surrounding the numerous write-ups he received for being late, as discussed *supra* Section II C 1 vii and, particularly, the context in which they were issued, a reasonable fact finder could determine that Mr. Hardy was subjected to a hostile work environment. Thus, summary judgment on this claim was inappropriate.

### ii. Constructive Discharge

In his brief on appeal, Mr. Hardy states the following as the factual basis of his claim of constructive discharge:[34]

> Appellant's transfer to the Avon Williams campus to walk empty hallways in an empty building was a demotion, constituting a reduction in job responsibilities and menial work. Appellant also was humiliated by being called a liar and accused of causing dissention. Here, the intent of the employer to fire Appellant is clear – so much so, that Chief Russell testified

---

[33] Although TSU fails to cite to evidence in the record which it contends Mr. Hardy cannot prove was severe or pervasive harassment, we will consider the evidence TSU cites as constituting a lack of proof of intolerable conditions in this context.

[34] To the extent there are factual allegations in this narrative, there are no citations to the record. *See* Tenn. R. App. P. 27(a)(7).

she planned on firing him based upon an incident occurring over one year previously if he had not resigned. The employer's intent is shown by TSU firing Appellant after he resigned.

Under Title VII & THRA, discharge and constructive discharge clearly are covered as adverse actions. Further, Appellant was moved from the main campus, where he was able to work out his hours with his secondary job, to the TSU downtown campus. This was done in retaliation for exercising his rights under Title VII and THRA and the Tennessee Public Protection Act.

The Tennessee Supreme Court has held that in order to set forth a claim of constructive discharge, the employee is required to show that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person would resign her employment." *Frye*, 227 S.W.3d at 612 (citing *Campbell*, 919 S.W.2d at 34). In *Logan v. Denny's, Inc.*, the court held that a claim of constructive discharge under Title VII requires that a plaintiff must show that (1) the defendant deliberately created intolerable working conditions and (2) that the defendant did so with the intention of forcing the plaintiff to resign. 259 F.3d 558, 568-69 (6th Cir. 2001).[35]

As evidence that Mr. Hardy cannot prove a causal link between harassing behavior and his departure, TSU relied on the affidavit of Tonya Christensen, in which she stated that Mr. Hardy was asked to resign his job at either DCS or TSU after DCS commenced an investigation that revealed that he was employed by both entities and was never approved for dual employment.[36] While this evidence does not specifically address whether TSU created intolerable working conditions with the intent of forcing his resignation, it is sufficient to show that Mr. Hardy cannot establish a causal link between any harassment at TSU and his resignation; thus, the burden is shifted to him to cite to evidence showing an issue of fact in this regard.

---

[35] Courts recognize two forms of constructive dismissal. *Frye*, 227 S.W.3d at 612 (citing *Holloway & Leech*, at 79; 2 Mark A. Rothstein, Employment Law § 8.7, at 256 (2d ed. 1999); Ralph H. Baxter, Jr. & John M. Farrell, *Constructive Discharge—When Quitting Means Getting Fired*, 7 Employee Rel. L.J. 346, 352-57 (1981)). The first is in the context of a hostile work environment claim, whereby the employer creates a hostile work environment for the purpose of rendering an employee's work environment so intolerable that the only reasonable alternative for the employee is resignation. *Frye*, 227 S.W.3d at 612. The second type of constructive discharge occurs where there is a demotion of an executive employee with a "position-specific contract." *Id*. Mr. Hardy claims constructive discharge based on the first form.

[36] Specifically, TSU argues that "all of [Mr. Hardy's] complaints of retaliation occurred more than one year prior to his voluntary resignation, and that his resignation from TSU was his choice after his superiors at DCS told him he must choose one job or the other."

In neither the trial court nor this court does Mr. Hardy cite to evidence establishing an issue of fact for trial. At the trial court, he argued that his constructive discharge claim was based on Chief Russell's "numerous requests to fire, demote and transfer" him and on his transfer to the downtown campus. On appeal, he reiterates these arguments. Again, notwithstanding the absence of citations, the evidentiary support for his argument is the same as that for the hostile work environment and we proceed to address the same.

Unlike our earlier determination that the evidence of circumstances surrounding the numerous write-ups he received established a genuine issue for trial relative to a hostile work environment, the evidence does not establish an issue of fact that his resignation was causally related to the work environment. *See Campbell v. Florida Steel Corp*.[37] He has failed to cite to any evidence in the record to show a genuine issue that his resignation was causally related to harassment at TSU rather than the directive he received from DCS. He was not entitled to summary judgment on this claim.

## III. CONCLUSION

For the foregoing reasons, we affirm the grant of summary judgment to TSU on the claim for retaliatory discharge arising under the Tennessee Public Protection Act; we affirm the grant of summary judgment on Mr. Hardy's claim for constructive discharge arising under Title VII of the Civil Rights Act of 1964 and the Tennessee Human Rights Act; we affirm the grant of summary judgment as to five of the seven incidents which comprise his claims of retaliation under Title VII of the Civil Rights Act of 1964 and the Tennessee Human Rights Act, and reverse the grant of summary judgment on the claims of retaliation arising from the transfer to the downtown campus and from multiple warnings he received for tardiness; we reverse the grant of summary judgment as to his claims for hostile work environment arising under Title VII of the Civil Rights Act of 1964 and the Tennessee Human Rights Act with respect to numerous write-ups that he received.

---

[37]   In *Young v. Southwestern Sav. & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir. 1975), the former Fifth Circuit determined that when "an employee involuntarily resigns in order to escape intolerable and illegal employment requirements" to which the employee is subjected because of race, color, religion, sex, or national origin, the employer has committed a constructive discharge in violation of Title VII of the Federal Civil Rights Act.

*Campbell*, 919 S.W.2d  at 33-34.

The case is remanded further proceedings related to those claims.

_____
RICHARD H. DINKINS, JUDGE